STATE OF MINNESOTA *vs.* HENRY H. SIBLEY and others.

January 11, 1879.

Corporation—Charter—"Associates."—The original charter of the Minnesota Historical Society enacts in terms, " That C. K. Smith," (and eighteen other persons designated by name) "and their associates, be and they are hereby constituted a body corporate and politic, by the name of the Minnesota Historical Society, and by that name they and their successors shall be, and they are hereby made capable in law to contract, * * * and to enjoy all the privileges and franchises incident to a corporation." So far as appears, the legislature granted the charter of its own motion, without any petition or application from any one. *Held*, 1. The word " associates" as here used, referred to such persons other than those specifically named as might thereafter become members of the corporation which was created by the act.

Same—Power to admit New Members.—2. The corporation had the right under its original charter of admitting new members as one of its incidental powers.

Same—Corporate Powers, in whom vested.—3. The corporate powers conferred by such charter were vested in the corporation, and, after its organization, the right of exercising such powers resided in the whole body of its members acting in an organized capacity, and in obedience to the will of a majority, and not in the nineteen original grantees and their successors alone.

Same—Admission of New Members.—When the charter of a private corporation aggregate contains no provision regulating the admission of new members, nor any restriction upon the subject, the whole matter is within the control of the corporation.

**Same—Omission to sign Constitution.**—A mere omission through inadvertence to sign the by-laws and constitution adopted by a corporation, will not invalidate a membership that has been asserted by a party claiming it, and distinctly recognized and acquiesced in by the corporation for a long period of time without any objection.

**Same—Amendments of Charter—Acceptance.**—Where an amendment to the charter of such private corporation is silent upon the subject of its acceptance by the corporation, an acceptance may be shown by any corporate acts which necessarily imply a previous valid acceptance of the provisions of the amendment.

The Minnesota Historical Society was incorporated by the following act passed at the first session of the territorial legislature, and approved October 20, 1849 : (Laws 1849, c. 44 :)

"AN ACT TO INCORPORATE THE HISTORICAL SOCIETY OF MINNESOTA.

"*Be it enacted by the Legislative Assembly of the Territory of Minnesota :* That C. K. Smith, David Olmsted, H. H. Sibley, Aaron Goodrich, David Cooper, B. B. Meeker, A. M. Mitchell, T. R. Potts, J. C. Ramsey, H. M. Rice, F. Steele, Charles W. Borup, D. B. Loomis, M. S. Wilkinson, L. A. Babcock, Henry Jackson, W. D. Phillips, Wm. H. Forbes, Martin McLeod, and their associates, be, and they are hereby constituted a body corporate and politic, by the name and style of the 'Minnesota Historical Society;' and by that name, they and their successors shall be, and they are hereby made capable in law, to contract and be contracted with, sue and be sued, plead and be impleaded, prosecute and defend, answer and be answered, in any court of record or elsewhere, and to hold any estate, real, personal or mixed, and the same to grant, sell, lease, mortgage, or otherwise dispose of for the benefit of said society; and to receive donations to be applied as the donor may direct; and to devise and keep a common seal; and to make and enforce any by-laws not contrary to the constitution and laws of the United States or this territory; and to enjoy all the privileges and franchises incident to a

corporation; and that the property which the society may be allowed to hold shall not exceed five thousand dollars.

"Sec. 2. *Be it further enacted,* That any five members may, at any meeting of said society, constitute a quorum to do business, and shall, within one year from and after the passage of this act, organize, and, under such regulations as they may adopt, elect a president, two vice-presidents, a treasurer, and a secretary, who shall record the proceedings, do the correspondence, and file all communications he may receive touching the object of the society; which said officers shall hold their offices respectively until their successors are elected, which may take place every three years. The regular meetings of said society shall take place on the second Monday succeeding the annual meeting of the legislative assembly of said territory, at the seat of government; and the object of said society shall be the collection and preservation of a library, mineralogical and geological specimens, Indian curiosities, and other matters and things connected with, and calculated to illustrate and perpetuate, the history and settlement of said territory."

On November 15, 1849, at a meeting held by the persons named in the charter, the society was organized by the choice of officers, Alexander Ramsey, the then governor of the territory, being chosen president. At a meeting held on January 14, 1850, a constitution was adopted, containing, among others, the following articles:

Art. 2. The officers of this society shall be a president, two vice-presidents, a treasurer and a secretary, who shall severally perform the usual duties pertaining to their respective offices. Together, they shall constitute an executive council, having charge of the affairs of the society.

Art. 3. The election of officers shall take place every three years, on the second Monday succeeding the annual meeting of the legislative assembly of the territory of Minnesota, and the officers elected shall serve until their successors shall be chosen.

Art. 4. All members to be approved by the executive council, and subscribe to the constitution. Resident members to pay an admission fee of one dollar, subject thereafter to an annual assessment of one dollar. The payment of fifteen dollars shall entitle a person to the privileges of a life membership, and fifty dollars to constitute a perpetual member, which is hereby made transferable.

Art. 8. The constitution may be altered and amended only at an annual meeting—notice of such proposed alteration having been given. to the executive council, in writing, at least three months previously.

At the same meeting, the following, among other by-laws, were adopted.

1. The officers of the society shall be elected by ballot, a majority of the votes being necessary to constitute a choice.

2. Five members shall be necessary to form a quorum for the transaction of business, but a less number may adjourn.

3. The president shall preside at every meeting of the society when present, call meetings of the executive council whenever he may deem it advisable, and discharge the duties pertaining to his office generally.

10. Resident members shall pay their initiation fee, and sign the constitution, before participating in the business of the society.

At this meeting a large number of persons, not named in the act of incorporation, were admitted to membership and signed the constitution, and from time to time afterwards others were admitted. These persons acted as members, and some of them were elected to office in the society, although they had not signed the constitution. Among these were Alexander Ramsey, (the first president,) D. A. Robertson and J. H. Murphy, neither of whom signed the constitution till 1878, shortly before this suit was brought. The society thus constituted and organized continued to act under the original constitution and by-laws until 1856, when the following act

was passed by the territorial legislature, and approved March 1, 1856.   (Laws 1856, *c.* 15.)

"AN ACT TO AMEND AN ACT ENTITLED, 'AN ACT TO INCORPORATE THE HISTORICAL SOCIETY OF MINNESOTA.'

"*Be it enacted by the Legislative Assembly of the Territory of Minnesota:*

"Section 1. That in addition to the privileges and immunities granted, and duties assigned to the Minnesota Historical Society, by the act approved October 20, 1849, the said society shall be allowed to receive by bequest, donation or purchase, any amount of property, real or personal, and shall hold the same in perpetuity, as a sacred trust for the uses and purposes of said society, without in any manner mortgaging, or by debts encumbering such property now in possession, or thereafter to be acquired; nor shall any such property be liable, in any manner or form whatever, for any debt contracted by said society; and the real property now vested in the society, in the city of St. Paul, and the building hereafter to be located thereon, as a hall for the same, and the personal property of the society, shall be exempt from taxation.

"Sec. 2. As soon as convenient after the passage of this act, the society shall elect an executive council, consisting of not more than twenty-five members of the society, who shall hold their office for the term of three years, and until their successors are elected, which election shall thereafter take place triennially.   The executive committee shall elect and appoint all officers, and such agents and collaborators of the society, resident and non-resident, as they may deem necessary or useful; and the executive council shall have the custody of all the property, real and personal, of the society, and shall frame such by-laws and constitution for their government as they may deem expedient, and do all other things not inconsistent with this act, essential to the prosperity of the society.

"Sec. 3. The objects of said society, with the enlarged powers and duties herein provided, shall be, in addition to the col-

lection and preservation of publications, manuscripts, antiquities, curiosities, and all other things pertaining to the social, political and natural history of Minnesota, to cultivate among the citizens thereof a knowledge of the useful and liberal arts, science and literature.

"Sec. 4. That all acts and part of acts, so far as they are inconsistent with the provisions of this act, are hereby repealed."

This act was passed not at the instance of the corporation, nor any of the corporators named in the act of 1849, who were living when this proceeding was instituted, nor, so far as appears, at the instance of any of those corporators who had died prior to the institution of this proceeding.

The records of the society show that on March 21, 1856, a special meeting was held, "pursuant to notice, Ex-Gov. Ramsey, the president in the chair," at which meeting it was "*resolved*, that the amendatory act be accepted by the society, and that we now proceed to the election of an executive council," which was done, and twenty-five gentleman, including several of the corporators named in the act of 1849, were elected to constitute such council. None of the said original corporators now surviving were present at that meeting, or had any notice thereof. Ever since such meeting the society has practised the election of an executive council, as provided in the act of 1856, and such council has had charge of the property and directed the affairs of the corporation. Since the passage of that act the property of the society has greatly increased, many new members have been admitted, and the legislature, at nearly every session, has appropriated money for its use, in amounts ranging from $500 to $3,000; and the existence of the society is recognized in section 1, article 15, of the constitution. At no meeting of the society, nor in any communication to it, did any of the corporators named in the act of 1849 raise any question as to the amendatory act of 1856 having become a part of the charter of the society.

On May 2, 1877, eleven of the nineteen corporators named in the act of 1849 having died, five of the eight survivors met at St. Paul, and elected eleven persons as members of the corporation, in the place of the deceased members; and a record of the proceedings of this meeting, signed by seven of the eight survivors, was filed with the secretary of state. These persons thereupon, claiming that they alone constituted the Minnesota Historical Society, met on May 23, 1877, and elected officers, and voted to accept the provisions of sections one, three and four of the act of 1856, and adopted by-laws. A controversy having thus arisen as to which of these bodies, the one represented by the executive council, and the other composed of the eight surviving original corporators and the eleven associates thus chosen by them, was entitled to the name, franchises and property of the Minnesota Historical Society, the legislature of 1878, in making the usual annual appropriation for the society, coupled it with a proviso that no part of such appropriation should be drawn from the treasury by either of the bodies claiming to be the corporation, "until the question, 'Who are the rightful custodians and managers of the trusts and assets of said society?' shall have been determined by the judgment or decree of a competent tribunal." Laws 1878, c. 97.

Soon afterwards, the body represented by the executive council caused this proceeding by writ of *quo warranto* to be instituted in this court by the attorney-general in the name of the state, against the eight surviving original corporators and their eleven associates, for a determination of the question thus propounded by the legislature.

*Geo. P. Wilson,* Attorney General, *John B. Sanborn,* and *W. P. Clough,* for the State.

*William Barrett,* for respondents.

1. The charter of the Minnesota Historical Society is an executed contract between the state and the corporators named therein, and as such is within the prohibition of § 1, art. 10, of the federal constitution, and the legislature cannot

repeal, impair or alter it, against the consent or without the default of the corporation judicially ascertained and declared. *Dartmouth College* v. *Woodward*, 4 Wheat. 518.

And it is also the well-settled doctrine of the English authorities that a charter is such a contract. *Rex* v. *Passmore*, 3 Term Rep. 199, 246.

In the charter of this society there is no reservation. The grant was absolute and unqualified. Laws 1849, *c. 44.*

2. The legislative grant of the franchise, privileges and immunities in the act of incorporation created a trust, and the corporators named, and their successors, were made the trustees thereof, and as such were to receive and hold, in perpetuity, that franchise, its privileges and immunities, together with all the funds and property that thereafter might be acquired. Laws 1849, *c. 44*; Tiffany & Bullard on Trusts, 473; Hill on Trustees, 67, 48, and cases cited; Perry on Trusts, §§ 39–44, and cases cited.

The four essentials necessary to the creation of a trust existed here, viz.: (1) *A subject-matter:* All property of a valuable nature, not only everything that may be legally transferred or disposed of, but also many things which the rules of the common law do not recognize as available property, or do not permit to be dealt with by assignment, may be made the subject-matter of a trust. Hill on Trustees, 44; Perry on Trusts, §§ 67–68; Tiffany & Bullard on Trusts, 1–2; Story Eq. Jur. § 964. The franchise, privileges and immunities of a corporation are property, and, not infrequently, most valuable property. "All incorporeal hereditaments, whether they be immunities, dignities, offices or franchises, or other rights, are deemed valuable in law. The owners have a legal estate and property in them, and legal remedies to support and recover them, in case of any injury, obstruction, or disseizin of them." *Per* Story, J., in *Dartmouth College* v. *Woodward*, 4 Wheat. 518. And see *Gordon* v. *Appeal Tax Court*, 3 How. 150. *West River Bridge Co.* v. *Dix*, 6 How. 534, 543; *Piscataqua Bridge Co.* v. *N. H. Bridge Co.*, 7 N. H. 35, 66; 2

Redfield on Railways, 435 and note, 453–4. (2) *A person competent to create a trust:* The state itself, by its legislation, or by its public officers, duly authorized, can create a trust, convey property, and appoint trustees. Perry on Trusts, §§ 28, 30; Tiffany & Bullard on Trusts, 2; *Commissioners of Sinking Fund* v. *Walker*, 6 How. (Miss.) 143. (3) *One capable of of holding as trustee :* Whoever is capable of taking the legal title or beneficial interest in property, may take the same in trust for others. Corporations, as well as persons, are capable of having the legal title or beneficial interest cast upon them by gift, grant, bequest, descent, or operation of law, and may take the same subject to a trust, and will become trustees; provided, the trusts are within the general scope of the purposes of the corporation, or if collateral to its general purposes, are germane to them, as where the trusts relate to matters which will promote and aid them. Perry on Trusts, §§ 39, 43; Hill on Trustees, 48; 2 Fonbl. Eq. 139; Angell & Ames on Corp. 124, Tiffany & Bullard on Trusts, 325; *Trustees of Phillips Academy* v. *King*, 12 Mass. 546 ; *Vidal* v. *Girard*, 2 How. 187; *Green* v. *Rutherford*, 1 Ves. 468; *Atty. Genl.* v. *Foundling Hospital*, 2 Ves. Jr. 46; *Atty. Genl.* v. *Lauderfield,* 9 Mod. 287. (4) *One for whose benefit the trust is held:* Corporations can be the *cestuis que trustent* of personal property to the same extent as individuals, and unless there are statutes which prevent them from taking the legal title to lands, they may also be the *cestuis qui trustent* of land. Perry on Trusts, § 63; Hill on Trustees, 52. The franchises granted by this charter were vested in the corporators in their corporate character as trustees of the society. The lands and other property subsequently acquired were held by them in the same manner. They were the private demesnes of the corporation, held by it "for the benefit of said society." *Dartmouth College* v. *Woodward*, 4 Wheat. 518. The charter of Dartmouth College and that of this society are almost identical in language.

3. This society is a private corporation of an eleemosynary

character, incorporated for the purpose of perpetuating the application of the bounty and donations that should thereafter be received to the particular objects and purposes specified in and contemplated by its charter. It is not, nor was it intended to be, a public corporation, in the sense that the whole interest in the foundation of the society belongs to the public. The charter grants certain privileges and powers to the corporators (the trustees,) and their successors, "for the benefit of said society," not for the sole benefit of the public, that is, the state. Laws 1849 *c.* 44, § 1. Its trustees were named in the charter, and were invested thereby with the power of perpetuating themselves. In no true sense can they be said to be public officers; nor is the corporation a civil institution, participating in the administration of government. It is a charitable institution, and comes within the spirit, if not within the letter, of the act of 43 Elizabeth. *Philips* v. *Bury,* 2 Term Rep. 346; *Dartmouth College* v. *Woodward,* 4 Wheat. 518; *Regents of Univ. of Md.* v. *Williams,* 9 Gill & J. 365; *Allen* v. *McKeen,* 1 Sum. 276; *City of Louisville* v. *Univ. of Louisville,* 15 B. Mon. 642; *State* v. *Adams,* 44 Mo. 570.

This charter, like the charters of our colleges, hospitals, and other eleemosynary institutions, created a perpetual trust. The right to exercise and discharge the powers and duties imposed by the creation of the trust, was conferred upon the nineteen persons named in the charter, and their successors, by them duly elected, and upon them alone. Their relation to this trust is fixed and determined by the original act of incorporation, and cannot be changed by any subsequent legislation which shall in any way impair, restrain or control the legitimate exercise of their powers and duties, or which shall transfer those powers and duties to other persons, because such legislation would be a violation of the obligations of the charter, no such right having been reserved therein.

4. The amendatory act of 1856, as a whole, has never been accepted by the corporation. The pretended acceptance of

that act at the meeting held March 21, 1856, was not an acceptance of the amendatory act by, and therefore is not and cannot be obligatory upon, the corporation. Angell & Ames on Corp. §§ 488–496; Field on Corp. §§ 327, 328; Grant on Corp. pp. 163–165; Dillon Mun. Corp. § 324; *People* v. *Batchelor*, 22 N. Y. 128, 146; *Downing* v. *Rugan*, 21 Wend. 178; *Burgess* v. *Pue*, 2 Gill, 254; *Stow* v. *Wyse*, 7 Conn. 214; *Smyth* v. *Darley*, 2 H. L. Cas. 789: *Com.* v. *Cullen*, 13 Pa. St. 133; *Ill. River R. Co.* v. *Zimmer*, 20 Ill. 654.

5. Only those provisions of the amendatory act of 1856 which have been accepted by the corporation are obligatory upon it. The provisions of sections 1, 3 and 4 of that act, not conflicting with or impairing any of the provisions of the act of incorporation, and having been accepted and adopted by the corporation, by its formal vote and act of May 23, 1877, have become and are a part of its paramount law, and are therefore obligatory and binding upon it.

A corporation may accept a part, or parts, of a legislative act in amendment of its charter, or they may accept or reject it as an entirety. *Rex* v. *Passmore*, 3 Term Rep. 240; *Rex* v. *Amory*, 2 Term Rep. 515; *Rex* v. *Vice Chan. of Cambridge*, 3 Burr. 1647; *Rex* v. *Barzey*, 4 Maule & Sel. 253; *Woodfork* v. *Union Bank*, 3 Coldw. (Tenn.) 488; Angell & Ames on Corp. § 85; Minor's Institutes, 521.

6. Section two of the act of 1856 is unconstitutional and void, because it undertakes to add to the number of the trustees fixed and named in the charter, and because it seeks and assumes to change and transfer the control and management of the corporation—in other words, because it impairs the obligation of a contract. *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 662–3; *Allen* v. *McKeen*, 1 Sum. 276; *Regents of Univ. of Md.* v. *Williams*, 9 Gill & J. 365; *State* v. *Adams*, 44 Mo. 570; *State* v. *Heyward*, 3 Rich. Law (S. C.) 389; *Norris* v. *Abingdon Academy*, 7 Gill & J. 7.

7. Said section two being unconstitutional and void, no

mere acquiescence in or acting under it, by the corporators—
no matter if it may have been for more than twenty years—
can give to that section life or vitality. *Allen* v. *McKeen*, 1
Sum. 276; *Regents* v. *Williams*, 9 Gill & Johns. 365; *State* v.
*Adams*, 44 Mo. 570; *State* v. *Heyward*, 3 Rich. Law (S. C.) 389.

8. The word "associates," in a charter of an eleemosynary
corporation can have no possible force or meaning; it is
superfluous. *Lechmere Bank* v. *Boynton*, 11 Cush. 369; *Duncan* v. *Beard*, 2 Nott & McCord, 400. The office and duties of
trustees being matters of confidence cannot be delegated by
them to others. They cannot add to their number "associates," to aid in the execution of the trust.

If the foregoing positions are correct, no person claiming
to be a member of this society, either by virtue of the second
section of the act of 1856, or of the word "associates" in the
act of incorporation, has ever acquired any membership in
said corporation thereby or thereunder.

CORNELL, J.* Substantially the claim of respondents, as
set forth in their answer, is based upon the proposition that
the corporation which was created by the territorial act of
October 20, 1849, contains and can contain but nineteen members, and those the corporators therein named, and such others
as have since been or may hereafter be chosen by such body
to fill any vacancies in their number occasioned by death or
otherwise; and that the corporate body, as thus constituted,
is rightfully entitled to the exclusive possession and enjoyment of all the rights, powers, privileges and franchises which
were conferred by that act. In support of this proposition, it
is claimed that the word "associates," in the first section of
the charter, is without meaning, as there used, and has no
force or effect whatever. This claim is clearly repugnant to
the general rule of construction which requires some effect to
be given to every word or provision of a charter or statute,
whenever it can be done without violence to any other provision, or to the general tenor and purpose of the enactment.

*Berry, J., did not sit in this case.

As was said by Chief Justice Shaw, in delivering the opinion of the court in *Lechmere Bank* v. *Boynton*, 11 Cush. 380, "the term 'associates,' as often used in acts of incorporation, is ambiguous. It may mean those who are already associated with the persons named, or those who may come in afterwards." And the inquiry here, as it was there, is to ascertain in what sense the word is used in the particular charter under consideration.

In determining this question, it is admissible, if necessary, to consider any competent evidence *aliunde* the charter, in explanation of the ambiguity. If a charter, granted in terms to several persons therein named and their associates, was in fact granted upon the joint request and application of those named, and others associated with them in applying for it, it might reasonably be supposed that the legislature intended to embrace them all within the grant, and that the word "associates" was used to designate those of them not specifically named in the charter. If, however, the grantees so named had no actual associates at the time, or if the charter was given by the legislature of its own motion, and without solicitation or application from any one, the use of such term in the connection here found might very properly be regarded as intended to apply to such persons as might become members of the corporation, upon and after its organization. And this latter is evidently the sense in which the term is used in the charter under consideration; for it is not claimed nor pretended that it was procured by or upon the request of the grantees therein designated by name, or that it was founded upon any petition or application whatever.

That the term as here used is not meaningless, as claimed by respondents, is further apparent from the language and the whole tenor of the act itself. It is first enacted that the nineteen persons therein so designated, "and their associates, be and they are hereby constituted a body corporate and politic, by the name and style of the Minnesota Historical Society," and then, in proceeding to enumerate the specific

powers and franchises which are conferred, and how and by whom they shall be exercised, this significant language is used: "And by that name they" (the corporators and their associates) "and *their* successors shall be, and they are hereby made capable in law to contract and be contracted with, sue and be sued," etc. The legislature could scarcely have chosen more plain and unequivocal language in which to express an intention that the continuous artificial body it was about to create should consist of a membership comprising the grantees named in the charter, their associates, and the successors of both of these classes, instead of the successors of the original grantees alone; and that the powers and franchises vested in the corporation should belong to it as representing, for the time being, the entire body of its then existing members, of whatever class. The grantees so named in the act as the then sole possessors of the franchises, had, of course, the exclusive right of rejecting the charter, or of accepting its provisions, and organizing the corporation under it. When this latter was done, their functions as such original corporators, merely, were at an end. The society thereupon at once sprang into active life and being as a distinct corporate entity, and became immediately possessed of all the rights, privileges and franchises expressly conferred by the charter, and endowed with all such other incidental powers and attributes, not prohibited by it, as belong, under such circumstances, to every private corporation aggregate. It had, therefore, the right to admit new members at pleasure, for every such corporation possesses that incidental power when not restrained by its charter, and the charter in this instance contains no such restriction. Angell & Ames on Corp. § 83. In the exercise of this, as of every corporate power not regulated by some charter provision, it could provide general rules upon the subject in its by-laws, subject to alteration and amendment, prescribing the terms and conditions of membership, and the mode of admitting new members, or it could determine each case as it arose, according to its own

pleasure; "for in every case involving the exercise of a corporate power not otherwise regulated in the charter, the sole law of the corporation is the collective will of a majority of its members, as expressed while regularly acting together in a body, in their organized capacity."

The society, in this instance, at its first organized meeting, and before the adoption of any by-laws, elected as its first president, for the term of three years, without objection so far as appears, an honored and distinguished citizen, who forthwith took upon himself the duties of the office, and thenceforth for the entire term continued to exercise its functions, without question as to his right so to do. He has since been re-elected, and held the same office, and has always exercised and enjoyed the rights, and borne the duties and responsibilities of a member. Yet it is now claimed that he has never been such in fact and in law, for the reason that he was not one of the original corporators named in the charter, nor the lawful successor of one, and for the further reason that for a long time after the adoption of the constitution and by-laws of the society, he failed, through inadvertence or otherwise, to sign the same, in accordance with a direction therein contained. Like objections are urged against the asserted legal rights of other parties to be considered members, who, though admitted under and in pursuance of the by-laws, and constantly recognized and allowed to act as members by the society in all its corporate transactions and doings for years, have, nevertheless, omitted likewise to comply with this requirement of the by-laws. The first of these objections, which applies also to all members who have been admitted under the by-laws of the society, has already been sufficiently considered, and held invalid, on the ground that the corporate right of admitting new members was vested in the corporation representing all its members, and not in the original nineteen and their successors alone. The other objection is equally untenable... The provision of the by-laws in question is simply directory. A mere failure to comply with it, unintentionally, as was

v.25m—26

manifestly the fact here, if followed for years by an active participation in the corporate doings of the society, without question from any one, will not invalidate a membership thus asserted, acted upon and acquiesced in. The foundation of the right of membership is the mutual consent and agreement of the corporation and the party claiming or asserting it; and in all cases where this exists, and the fact of membership has been distinctly recognized and acted upon by both parties for years, the right exists, unless there is some specific provision in the charter to the contrary. The election of a party to an office whose duties can only be performed by a member of the corporation, and permitting him to enjoy and exercise its functions for a long period of time, unchallenged by any one, are corporate acts of the strongest character, evidencing an assent of the corporation to the admission of such party to all the rights and privileges of membership. Upon this branch of the case, the conclusion is that the corporate body which was created by the original charter of October 20, 1849, consisted, at the time the amendatory act of March 1, 1856, was passed, of the then remaining members of the corporators first named in the charter, and such their then associates as had been theretofore admitted to membership by the society, according to its by-laws, or in any other lawful way.

This brings us to the consideration of the question, whether said act of 1856 has been accepted in its entirety by the society as thus constituted? The act itself is silent upon the subject of its acceptance. The original charter contains no provision regulating the manner in which the corporate right of consenting to amendments shall be exercised, nor providing for its exercise, for and in behalf of the society, by any body of its officers, or any portion of its members. The right therefore resides in the corporation itself, to be exercised by and through the collective body of all its members. A formal vote of acceptance, by a majority of such body, duly convened for that purpose, would be an acceptance binding upon the corporation. But this mode of acceptance is not

indispensable, when, as in the case before us, no statutory provision exists requiring it. It may be done by any corporate act which clearly recognizes the validity of the amendment, and necessarily presupposes an acceptance of its provisions and benefits by the corporation; and if the new act grants additional powers and privileges to the company of a beneficial character, an acceptance may be presumed upon slight evidence. These rules are too well settled upon principle and authority to require discussion, or to admit of dispute. Angell & Ames on Corp. § 83; *Sons of Temp.* v. *Brown,* 11 Minn. 254 (356;) *Bangor, etc., R. Co.* v. *Smith,* 47 Me. 34; *Com.* v. *Cullen,* 13 Pa. St. 133.

· That there has been an unqualified acceptance by the society, in this case, of all the provisions of the act of March 1, 1856, is beyond any reasonable controversy upon the evidence before us. At a special meeting held soon after its passage, a resolution was adopted and spread upon the records of the society, declaring an acceptance in express terms, and that it would then proceed to the election of an executive council under its provisions, to take charge of the affairs of the corporation, as was therein provided; and such council was there and then unanimously elected by the members then present. Conceding the irregularity and even the invalidity of these proceedings, as claimed by respondents, on the ground that the requisite notice of such meeting had not been properly served upon all the members, it is clearly shown that their validity has remained unquestioned, and been distinctly and repeatedly recognized and acted upon by the society at various subsequent regular meetings, and by various corporate acts, for over twenty years. The entire administration of the affairs of the society, for that whole period, has been conducted by the executive council then chosen and ever since continued under the provisions of section 2 of the amendatory act, by the exercise on its part of the corporate powers of the society, and by the selection of its agents and officers, as therein provided, and this without any protest whatever

from any one, until quite recently. The additional privileges and powers granted by that act have also been used by the society in acquiring and holding, exempt from taxation, a. large amount of real and personal property, in excess of the limit prescribed by the original charter. Under these circumstances, there would seem to be no ground for any serious. controversy over the question of acceptance.

For the reasons above given, the court awards judgment of ouster against the respondents.