STATE OF MINNESOTA ex rel. NILS C. BRUN and Others v. SVEN OFTEDAL and Others.

June 9, 1898.

Nos. 11,008—(30).

Charitable Corporation—Augsburg Seminary—Defective Articles— Amendment.

Five persons organized themselves into a private charitable corporation, under G. S. 1866, c. 34, tit. 3, by the name of "The Norwegian-Danish Evangelical Lutheran Augsburg Seminary." The articles were defective, in that they contained no provisions for the admission of new members. They provided for a board of five trustees (the five corporators being named as the first board), and fixed the time and place for their election, but did not state in express terms by whom they were to be elected. *Held,* that the power to amend the articles of incorpora-

tion and to admit new members and to elect trustees was vested in the five incorporators.

## Same—Election of Trustees.

For nearly 20 years thereafter trustees of the corporation were elected by an unincorporated voluntary association called "The Conference of the Norwegian-Danish Evangelical Lutheran Church of America," composed of the ministers, theological professors, and delegates from the congregations belonging to the conference. The trustees thus elected assumed to perform all the duties of the office, with the consent of the incorporators, who during all that time neither exercised nor attempted to exercise any corporate powers. In February, 1877, the legislature passed an act (Sp. Laws 1877, c. 245) entitled "An act ratifying and confirming the election of trustees of the Norwegian-Danish Evangelical Lutheran Augsburg Seminary." In 1885 the trustees elected by the conference assumed to amend the articles of incorporation so as to provide for the election of trustees by the conference. In 1890 the conference formed a union with certain other religious bodies of substantially the same faith and form of government under the name of "The United Norwegian Lutheran Church of America." In 1892 the five original incorporators amended the articles of incorporation so as to provide for the admission of new members by the existing members, and then admitted 25 new members. The 30 members, as thus constituted, thereafter elected respondents (appellants here) to the offices of trustees of the seminary corporation. The conference of the United Church elected the relators to the same offices. In a proceeding by information in the nature of quo warranto, instituted by the relators to oust the respondents, and to induct themselves into the offices of trustees, *held*:

## Quo Warranto—Relators Must Show Title to Office. .

(1) The corporation being a private one, it was incumbent on the relators to show title to the offices in themselves before they could inquire into the title of the respondents.

## Sp. Laws 1877, c. 245, § 3, Unconstitutional—Title of Act.

(2) That the prospective provisions of the third section of the act of 1877 are invalid, for the reason, if no other, that they are not expressed in the title of the act.

## Charitable Corporation—Trustees—Power to Amend Articles.

(3) The trustees of a corporation, whether de jure or only de facto officers, are mere agents of the corporation, and have no authority to amend the articles of incorporation.

**Same—Usage in Electing Trustees—Acquiescence—Membership.**

(4) The usage or custom of the conference to elect the trustees of the corporation, although acquiesced in by the original incorporators for 20 years, did not have the effect of admitting to membership either the members of the conference or all the members of the congregations belonging to the conference.

**Same—Curative Act.**

Neither the curative act of 1877 nor the general curative acts of 1881 or subsequent years (G. S. 1894, §§ 3402-3405) had the effect of legalizing and authorizing the continuance of the usage or custom of electing trustees of the corporation by the conference.

Information in the nature of quo warranto in the district court for Hennepin county to oust Sven Oftedal, Olaf Hoff, Ole Paulson, Theodor Helgeson and Andrew Knutson from the offices of trustees of a corporation called the Augsburg Seminary and to induct relators into said offices. The case was tried before Russell, J., who found and ordered judgment in favor of relators. From an order, McGee, J., denying a motion for a new trial, respondents appealed. Reversed.

*Fred T. Merritt* and *Brooks & Hendrix*, for appellants.

Relators must show title in themselves before they can inquire by what authority respondents exercise their office. High, Ex. Rem. § 652; Miller v. English, 21 N. J. L. 317; State v. Kupferle, 44 Mo. 154; McDaniels v. Flower, 22 Vt. 274; State v. Hunton, 28 Vt. 594; State v. Brown, 34 Miss. 688; People v. Pease, 30 Barb. 588; People v. Thacher, 55 N. Y. 525. The power of admission to, and expulsion from, membership in a corporation resides in the whole body, and cannot be delegated except by the charter. State v. Chamber, 20 Wis. 63; Hibernia v. Com., 93 Pa. St. 264; 1 Thompson, Corp. § 847. The execution of the original articles of incorporation did not have the effect of incorporating the conference or its members as such. Nor does the fact that the five persons signing the articles of incorporation were the trustees of the conference change the case. They were not named as members of any church, nor as trustees, but as individuals; and even if they had incorporated as trustees of the conference, nevertheless, unless the trustees

were the conference before they became incorporated, their incorporation was not the incorporation of the conference. Trustees v. Guthrie, 86 Va. 125; Wilson v. Perry, 29 W. Va. 169. The corporation of Augsburg, upon the adoption and filing of the articles, followed by user, became a corporation, wholly distinct from and independent of the conference. The conference, being an unincorporated voluntary association, whose membership was constantly shifting and changing, could not own property, nor could any person, natural or artificial, own property in trust for it. Trustees v. Clark, 41 Mich. 730; German Land Assn. v. Scholler, 10 Minn. 260 (331); Little v. Willford, 31 Minn. 173; Gille v. Hunt, 35 Minn. 357; Society of the Most Precious Blood v. Moll, 51 Minn. 277; Lane v. Eaton, 69 Minn. 141; G. S. 1894, § 4274. The corporation existed as a legal entity, wholly distinct and apart from the conference. The latter body had no control over it, not even the power of visitation. It had no power or right to elect its officers, or in any respect to supervise its acts. Stevens v. Willard, 43 Vt. 692. Where the trustees or governors are incorporated to manage the charity, the visitorial power is deemed to belong to them in their corporate character. Angell & Ames, Corp. § 687; Fuller v. Trustees, 6 Conn. 532; 2 Kent, Com. 302; Clark v. Oliver, 91 Va. 421; Ludlam v. Higbee, 11 N. J. Eq. 342; Perry, Trusts, § 733; Trustees v. Hunn, 7 Tex. Civ. App. 249. The five original incorporators, in the first instance at least, comprised the whole membership of this corporation, and, unless new members were by some means previously admitted to the corporation, they retained the right to its exclusive control, and could lawfully amend its articles, as they undertook to do on August 3, 1892. The corporation became a corporation de facto, and though the incorporators, as such, held no meeting and performed no corporate act for twenty years they did not thereby forfeit their franchise or the property. Morrill v. Little Falls, 53 Minn. 371. Sp. Laws 1877, c. 245, or as least section 3, was invalid because not germane to the title of the act. State v. Kinsella, 14 Minn. 395 (524); State v. Chapel, 63 Minn. 535; Brieswick v. Mayor, 51 Ga. 639; Williamson v. City, 44 Iowa, 88; People v. Mellen, 32 Ill. 181; Thomas v. Collins, 58 Mich. 64; Cooley, Const. Lim. (5th Ed.) 179; Mewherter v. Price, 11 Ind. 199; Ryerson v.

Utley, 16 Mich. 269; People v. Hills, 35 N. Y. 449; Winona & St. P. R. Co. v. Waldron, 11 Minn. 392 (515); Mississippi & R. R. B. Co. v. Prince, 34 Minn. 79;. State v. Murray, 41 Minn. 123; Simard v. Sullivan, 71 Minn. 517.

*Orville Rinehart,* for appellants, also filed a brief.
*Emanuel Cohen* and *Andreas Ueland,* for respondents.

MITCHELL, J.[1]

This proceeding is an information in the nature of quo warranto, instituted by the relators against the respondents (appellants here) to oust them from the offices of trustees of a corporation called the Augsburg Seminary, and to induct the relators into the offices. The very voluminous record contains a vast amount of matter which we consider wholly irrelevant to the issues.

The following statement contains all the facts that are at all material: The Conference of the Norwegian-Danish Evangelical Lutheran Church of America was a voluntary unincorporated association, composed of such Norwegian and Danish Evangelical Lutheran congregations and ministers as should adopt the constitution of the conference. Each congregation was represented in the conference by not more than two delegates, elected by the congregations themselves. The instructors in the theological seminary of the association were also members of the conference. The conference had adopted a constitution or body of rules providing, among other things, for the election by itself of a board of trustees to have charge of the temporal affairs of its theological seminary and a board of directors to have charge of its internal affairs, such as the course of study, the admission of students, etc. This seminary was located at Marshall, Wisconsin. The theological creed or confession of faith adopted by the constitution of the conference was the Holy Scriptures of the Old and New Testaments as God's revealed word, and the only rule of faith, teaching and life, the symbolical and confessional writings of the Norwegian-Danish Lutheran Church as a true and pure statement of the teachings of the Word of God, and consisting of the ancient symbols,—the Apos-

[1] BUCK, J., absent, took no part.

tolic, Nicene, and Anthanasian,—and the unaltered Augsburg Confession and Luther's Smaller Catechism, understood-in harmony with the exposition thereof contained in the remaining Lutheran confessional writings.

In 1871 certain citizens of Minneapolis offered the conference real and personal property of the value of about $4,000 as an inducement to remove the seminary to that city. Part of the property consisted of a proposed building site. The conference accepted the offer, and appointed a building committee with authority to erect a seminary building on the donated site with the remaining means given by the citizens of Minneapolis and contributions by the congregations belonging to the conference. This building was in process of erection when the conference held its annual meeting in 1872. At that meeting it elected, in accordance with its previous custom and the rules previously adopted, a board of five trustees, to have charge of and manage the property and temporal affairs of the seminary. These trustees accepted the office, and entered upon the discharge of their duties as such. It being deemed necessary that a corporation should be formed to take and hold the title to the seminary property, five persons (called in the record the original incorporators), in July, 1872, attempted to organize themselves into a corporation, under G. S. 1866, c. 34, tit. 3, under the name of "The Norwegian-Danish Evangelical Lutheran Augsburg Seminary."

The trial court found that these persons were the five trustees of the seminary previously elected by the conference. This finding is challenged by the appellants as not justified by the evidence. While we cannot find any express or direct evidence that such was the fact, we think it is clearly inferable from what followed. These incorporators actually adopted, signed, and filed articles of association, and proceeded to transact business by taking and holding the title of the seminary property in the corporate name. Hence, in view of the curative acts of 1881, 1885, 1887, and 1891 (G. S. 1894, §§ 3402–3405), as well as of Sp. Laws 1877, c. 245, it became a corporation de jure as well as de facto, notwithstanding its failure to comply with the statutes in other respects. The purpose of the corporation, as stated in its articles, was

"The training and education of young men for the ministry of the Lutheran church in the United States by the establishing and maintaining of a theological seminary at Minneapolis, and furnishing instruction to students therein, with such preparatory aid thereto as the trustees of this corporation may deem proper."

The articles were defective, in that they contained no provisions for the admission of new members. They named a board of trustees (the five incorporators, and, as we think the evidence shows, the same persons who had been previously elected by the conference) to conduct the affairs of the seminary until the next annual election "as herein provided." The articles also provided that the time for electing trustees should be in the month of June in each year (the date of the meeting of the conference), "at such place as the annual conference of the Norwegian-Danish Evangelical Lutheran Church of America may be held," but failed to state—at least in express terms—by whom the trustees were to be elected. But it is very evident from the language used, in connection with the prior and subsequent conduct of all concerned, that the intention and expectation was that the trustees of the seminary were to be elected by the conference as theretofore.

The "incorporators" or "trustees" reported to the conference in June, 1873, what they had done, and the reason therefor, to-wit, for the purpose of holding the legal title of the seminary property for the conference. It does not appear that the conference took any formal action approving what had been done, but it made no objection, and by its subsequent conduct acquiesced in and approved of it. At that meeting, and annually thereafter for nearly 20 years, the conference elected trustees, who, under its direction, had the exclusive management and control of the property and temporal affairs of the seminary, and annually made a report to the conference of what they had done. They took the title to all property donated or contributed for the extension or maintenance of the seminary in the corporate name. During that time large contributions were made for the enlargement and support of the seminary, and now it has real and personal property of the value of $75,000. Aside from the donations by citizens of Minneapolis already referred to, and subsequent donations by them of between $3,000

and $4,000, all, or substantially all, of the funds for the support or improvement of the seminary were contributed by members of the congregations belonging to or affiliated with the conference.

During all this time the original incorporators held no meeting, and neither exercised nor asserted any right to or authority over the property or affairs of the seminary, or interposed any objection to the right of the conference to elect trustees, or to the right of such trustees to manage the affairs of the seminary. In fact, up to 1892 the only corporate act which they ever did or attempted to do was the execution and filing of the articles of association. For some time after the incorporation the boards of trustees elected by the conference consisted exclusively or mostly of these incorporators, and frequently in subsequent years some of the incorporators were elected trustees; and in every instance they accepted the office, and fully recognized the authority of the conference by reporting to it and obeying its instructions. Moreover at every annual meeting of the conference from 1873 to 1890, inclusive, two or more of these incorporators were in attendance and participated in the proceedings of the conference without interposing any objections to its election of trustees of the seminary.

In 1876 the trustees in their report to the conference called its attention to the defect in the articles of incorporation of the seminary, and recommended that they be amended so as to provide for the election of trustees by the conference. The conference approved of the proposed amendment, and subsequently, at the instance of the trustees and members of the conference, the legislature enacted Sp. Laws 1877, c. 245, entitled "An act ratifying and confirming the election of trustees of the Norwegian-Danish Evangelical Lutheran Augsburg Seminary." Section 1 of the act ratified and confirmed the election of trustees as the same had been theretofore elected by the conference. Section 2 ratified and confirmed all the official acts of said trustees theretofore done and performed in accordance with the articles of incorporation and the by-laws of the seminary. Section 3 amended article 5 of the articles by adding thereto the words, "The trustees aforesaid shall be elected by the Conference of the Norwegian-Danish Evangelical Lutheran Church of America." Both the trustees and the confer-

ence accepted the provisions of the act by acting under them, and the original incorporators made no objection.

In 1883 the conference passed a resolution directing the board of trustees to have the articles of incorporation of the seminary changed so that thereafter the trustees should be elected in the following manner, viz.: The first time, two trustees for three years, two for two years, and one for one year; and after that they should be elected, as their terms expired, for three years. Pursuant to this direction, the board, in 1885, adopted a resolution purporting to amend article 5 so as to read as follows:

"The board of trustees of this corporation shall consist of five (5) members. They shall be elected at and by the annual meeting of the Conference of the Norwegian-Danish Evangelical Lutheran Church of America, and shall hold office for three (3) years from the time of election, and until their successors shall be elected and shall have signified their acceptance of office. Of the trustees elected in 1885," A. and S. "shall hold office for three (3) years," O. and K. "for two (2) years, and" P. "for one (1) year."

The object of this amendment was that the terms of office of only a part, and not of the whole board, as theretofore, should expire in any one year. A certificate of this amendment, signed by the president and secretary of the board (but not sworn to by any one), was filed in the offices of the register of deeds and of the secretary of state, and thereafter the conference elected trustees in conformity with its provisions.

In addition to this conference, there existed three other Scandinavian Lutheran associations or bodies, respectively known as "The Anti-Missourian Brotherhood," "The Norwegian Augustina Synod," and "The Hauges Synod." Negotiations had been pending for some time looking to a union of all four in one association or body to be known as "The United Norwegian Lutheran Church of America," called in the record "The United Church." In 1889 committees representing these bodies formulated a proposed plan of union called "Articles of Union," and a proposed constitution for the United Church. These articles of union were unanimously adopted by the conference of the Norwegian-Danish Evangelical Lutheran Church of America at its annual meeting in 1889, and at

the same meeting the conference adopted the proposed constitution as a proposed amendment to its existing constitution, to be adopted at its annual meeting in 1890; and as such it was submitted for approval to the congregations belonging to the conference. They having approved of it, it was unanimously adopted by the conference at its annual meeting in 1890. The Hauges Synod did not adopt it, and never entered into the union.

It is claimed by the appellants that there is no evidence that the constitution was ever adopted by the Anti-Missourian Brotherhood or the Norwegian Augustina Synod; but we think it is wholly immaterial whether they did or did not adopt it. It does appear that each of these bodies did contribute to the United Church the sums of money provided for in the articles of union, and that the larger part of their congregations entered into the union. Of the 247 congregations belonging to the conference of the Norwegian-Danish Evangelical Lutheran Church of America, 217 entered into the union. As soon as the conference adopted the proposed constitution of the United Church, it adjourned, and its members united with the members of the Brotherhood and the Augustina Synod in organizing the conference of the United Church.

The confession of faith adopted in the constitution of the United Church consisted of the Holy Scriptures of the Old and New Testaments as God's word, and the only source and rule of faith, doctrine and life; the symbolical book or books of the Norwegian Evangelical Lutheran Church as a true embodiment of the doctrine of the Word of God, viz. the old symbols,—Apostolic, Nicene, and Athanasian,—and the unaltered Augsburg Confession and Luther's Smaller Catechism. It is contended that this differs essentially from the theological creed or confession of faith contained in the constitution of the old conference, but the points of difference, if any, are too microscopic to be detected by the judicial eye. It differed somewhat from the old constitution in some matters relating to membership and representation. But all of these amendments were authorized by, and adopted in accordance with, the provisions of chapter four of the old constitution.

The articles of union evidently contemplated that certain institutions of learning, and their property, theretofore belonging to and under the control of the several bodies forming the union, should belong to and be under the control of the United Church, and that, in order to carry this into effect, the United Church should become incorporated. The articles of union expressly provided that the Augsburg Seminary should be the theological school of the United Church. Consequently, at its annual meeting in June, 1891, the representative conference or assembly of the United Church adopted articles of incorporation, under Laws 1885, c. 151 (see G. S. 1894, §§ 3062–3069), under the name of "The United Norwegian Lutheran Church of America," the general purposes and powers of which were to receive, purchase, hold, convey, and manage property, real and personal, for religious, charitable, and educational purposes, and to transact all secular business and manage all temporal affairs of the church. The powers of the corporation were to be vested in and exercised by a board of nine trustees, to be elected by ballot at the annual meetings of the church, consisting of the duly-elected delegates of the congregations and their pastors, in accordance with the constitution of the United Church.

After thus incorporating, the church requested the trustees of the seminary to convey and transfer all of its property to the church. The then-acting trustees of the seminary, as we understand the evidence, had been elected by the old conference. The trustees declined to make the transfer, for the reason that, as advised by legal counsel, they had no power to do so. Thereupon, after considerable negotiation, not here important, the church requested the trustees to amend the articles of incorporation of the seminary so as to provide for the election of its trustees by the United Church. It was at this point that the real controversy arose.

As previously conducted, the seminary had a preparatory or academic department as an auxiliary or adjunct to the theological school. Inasmuch as the United Church had other institutions, particularly St. Olaf's, at Northfield, the discontinuance of the preparatory department of the Augsburg Seminary was contemplated. The trustees and "friends of Augsburg" declined to do anything towards giving the church control of the seminary unless they ob-

tained some positive guaranty that its preparatory or academic department should be continued. Upon this question the parties could not or would not agree. Finally, the five original incorporators, upon the theory that they were the sole members of the corporation, met, and amended the articles of incorporation by providing, among other things, that

"Any person who is a member in good standing of a Norwegian Lutheran church connected with the United Norwegian Lutheran Church of America may become a member of this corporation by being elected as such member by a majority vote of the then members of the corporation, and by his acceptance in writing of such election: provided, that as soon as, and whenever, the members of this corporation shall exceed thirty (30) in number, a two-thirds (2-3) vote of such members shall be necessary in order to elect new members."

Subsequently, after the controversy waxed warm, they again amended the articles by striking out the words "connected with the United Norwegian Lutheran Church of America," thus removing the last vestige of control or connection of the United Church over or with the seminary. This was the first time the original incorporators had exercised or asserted the right to exercise any corporate powers since they adopted the articles of incorporation in 1872. They further amended the articles by providing for the election of a board of five trustees by the members of the corporation at their annual meeting, whose term of office should be five years; also by designating five trustees to hold office respectively until the annual elections in June, 1893, 1894, 1895, 1896, and 1897. Under these amendments the five original incorporators elected 25 other persons as members of the corporation.

One of the appellants claimed to hold the office of trustee under the appointment under the last of these amendments, by which his term of office was not to expire until June, 1897, which was subsequent to the commencement of these proceedings. The other appellants claimed under elections by the 30 alleged members of the corporation, constituted as above, at their annual meetings in 1893, 1894, 1895, and 1896, respectively. This is the source of appellants' title to the offices. The conference of the United Church made no

attempt to elect trustees of the seminary until its annual meeting in June, 1896, at which it elected the relators to the office, the terms of office of all the last board elected by the old conference before the union having then expired.

Much evidence was introduced, and much is said in the briefs of appellants' counsel, as to the alleged fact that the prosperity of the seminary and the donations towards its enlargement and support were largely the results of the efforts of the so-called "friends of Augsburg" prior to the union; also that the seminary is now being efficiently managed by the appellants. Assuming all this to be true, we fail to see that it has any bearing on the legal issue in this case, which is the title to an office. The same may be said as to the alleged hostile acts of the United Church towards the seminary since this controversy commenced, by withdrawing their support from it, establishing another theological school, and expelling congregations and ministers for upholding the conduct of the appellants and the other "friends of Augsburg." Those things have nothing to do with the legal questions involved, and of their ethical character we are not the judges.

Great stress is also laid upon the fact that until 1896 the United Church never asserted, nor attempted to exercise, the right to elect the trustees of the seminary, but, on the contrary, admitted by their conduct that they had no such power. This amounts to nothing more than evidence of their views of the law at that time. There is nothing in it that would estop the United Church from afterwards asserting and exercising the right to elect trustees, if they in fact possessed the legal power to do so.

Without considering whether, upon these facts, the old conference had, or the United Church has, any right, cognizable in law or equity, to the management and control of Augsburg Seminary, or of the property the title of which is vested in that corporation, two facts conclusively appear:

First, that the intended beneficiary was, not the professors who might be appointed to teach, or the students who might be taught, in the institution, but the religious body or denomination represented by the Conference of the Norwegian-Danish Evangelical

Lutheran Church of America, the objects, as expressed in the articles of incorporation, being the training and education of young men for its ministry.

Second, that the intended object of the incorporation was solely to create a legal entity which might hold the legal title of the property donated or to be donated for the establishment and maintenance of a theological school for the denomination (the conference being unincorporated, and there not being then, or until 1885, any statute by which it could become incorporated), and that the actual intention and supposition was that the management and control of the seminary would be and remain, as before, in the conference, exercised through a board of trustees elected by itself.

The conduct of all parties concerned for 20 years is practically conclusive on this point, and the fair presumption is that contributions and donations during that time by members and friends of the denomination for the support and maintenance of the seminary were made upon the assumption that such was the fact. Some of the property, including the site upon which the buildings were erected, already belonged to the conference, as far as an unincorporated voluntary association of this kind could be the owner of property. It also appears clear to us, as a legal proposition, that the change of name and other minor changes in the constitution do not destroy the identity of the conference and the United Church, that the latter is but the continuation of the former, and that whatever rights, if any, the old conference had to the control of the seminary and its property are now vested in the United Church. McGinnis v. Watson, 41 Pa. St. 9. It is neither appropriate nor necessary at this time to determine whether the church has any such rights recognized by the law, or, if so, what the proper remedy would be. But, if it has any such right of which it has been deprived, a court of equity is equal to every emergency, and its machinery and process are sufficiently flexible to meet it.

But the sole question here is, which of the parties, relators or appellants, have the title to an office in a private corporation? The relators must, therefore, show title in themselves before they can properly inquire by what authority the respondents (appellants here) exercise their office. High, Extr. Rem. § 652. The power to

elect the trustees or directors of a corporation belongs (at least in the absence of a statute providing otherwise) exclusively to the members of the corporation. The relators were elected by the conference of the United Church. Therefore it is incumbent on them to show that the members of that conference, either individually or collectively, were the members of the corporation. They were certainly not made such by the original articles of incorporation. As these articles were originally adopted, the five incorporators were the only members, in whom exclusively was vested the power to amend the articles and admit new members.

Assuming, as we think the law is, that the first and second sections of Sp. Laws 1877, c. 245, are valid under the doctrine of Green v. Knife Falls Boom Corp., 35 Minn. 155, 27 N. W. 924, they are purely curative or retrospective, and merely validate what had been done in the past. The title of the act is wholly insufficient to embrace the prospective provisions of the third section, which is, therefore, wholly void under section 27 of article 4 of the constitution, even assuming that the legislature had the power to pass them under a proper title. The attempted amendment of the articles of incorporation in 1885 by the trustees elected by the conference in and of itself amounted to nothing, for even conceding that they were trustees de facto, they were the mere agents of the corporation, and had no power to amend the articles.

Counsel urged several other grounds in support of relators' title to the offices, but we think they may be all summed up in the proposition that all the ministers and members of the congregations belonging to the conference, or at least the members of the conference, became the members of the corporation by the mutual consent of the incorporators and the conference, as evidenced by their conduct. This may be very cogent evidence that the articles were adopted under a mutual mistake of both the incorporators and the conference as to their legal effect. The incorporators may also be estopped by their conduct from denying the validity of the official acts of the acting trustees elected by the conference. They may also have lost their membership by abandonment and nonuser for 20 years. But we are unable to discover any legal principle upon which it can be held that a usage or custom contrary to ex-

press statute, and based upon a misapprehension as to the relation of the parties to the corporation, can have the effect of making the membership of the congregations or of the conference members of the corporation. Indeed, there is no evidence that the members of the conference ever supposed or understood that they were members of the corporation. It is true that it appears that they supposed they had the right to elect its trustees, but they never assumed to exercise the corporate right to amend the articles of incorporation. On the contrary, whenever they thought these articles ought to be amended, they requested the trustees, whom they had elected, to do so. If this proves anything, it is that they supposed these trustees were the members, and the only members, of the corporation.

The statute (G. S. 1894, § 2917) expressly provided that the articles of incorporation, if amended, should be amended by the members of the corporation; also that they should contain the terms of admission to membership (section 2914). The very purpose of this latter provision is to remove, as far as possible, all doubt or controversy as to who are members. If the articles had provided who might be admitted, and how they should be admitted, these provisions would have controlled; but, if the relators' contention is correct, a corporation whose articles contain no such provisions has greater powers in that respect than one which has complied with the statute, and can, by virtue merely of an illegal custom or usage, admit to membership the members of an entire religious denomination or of an unincorporated voluntary association whose membership is uncertain and ever shifting and changing, and thus throw the membership of the corporation into a state of complete confusion and uncertainty. The power to determine who should be admitted or excluded from membership in the congregations belonging to the conference was vested in the several congregations themselves; also the power to elect their own delegates to the conference. The conference had the exclusive power of determining who were entitled to seats in it; in other words, who were its members. Hence, whether it be held that all the members of all the congregations or only the members of the conference became members of the corporation, its membership would be all in the air,

72 M.—33

—one thing to-day and another thing to-morrow,—and that, too, without any corporate act either admitting new or expelling old members. The power of admission to and expulsion from membership are corporate acts of equal dignity, the exercise of which cannot be delegated except by the charter.

Usage can never alter or repeal a statute, otherwise usage would be superior to the power of the legislature. The right to be a corporation is a franchise. This franchise resides in the corporation itself. It is a privilege not existing at common law, but only given by the express authority of the state. Unlike a conventional contract between natural persons, the state is a party to it, and when the legislature has prescribed the nature and extent of the franchise, and how it shall be exercised, the courts will never permit it to be enlarged or changed by a usage or custom in violation of the statute.

It should also be stated in this connection that there was no statute, at least until 1893, by which a corporation of the character of Augsburg Seminary could authorize any other body or association to elect its trustees. The only case cited by relators' counsel in support of their contention is State v. Sibley, 25 Minn. 387. In that case the persons claiming to be members, other than those named in the charter, were regularly admitted to membership by the charter members, and for nearly 30 years exercised the rights of members at all the corporate meetings, and were recognized as members by the corporation, but failed to sign the constitution as required by the by-laws; and all that this court really decided was that, upon these facts, they were members notwithstanding their failure to sign the constitution. It was held in that very case that the right of exercising the corporate powers conferred by the charter resided in the whole body of its members acting in an organized capacity.

There is one other point that should be referred to. Counsel for relators suggest that the several curative acts, particularly the special one of 1877, "operated upon the then status" of the corporation. If we understand them correctly, they mean by this that these acts operated upon this usage and custom of the conference to assume to exercise the rights of corporate membership by electing the trus-

tees of the corporation so as to authorize the continuance of such custom. If such is the effect of curative acts, they are exceedingly dangerous. But all that need be said in answer to this is that all of the provisions of the act of 1877 that are germane to its title are merely curative and retrospective, and that all that the general curative acts assume to do is to change into de jure corporations de facto corporations which had been attempted to be organized under the general laws of the state, and to legalize their past acts, performed while they were only de facto corporations. They do not assume to attempt to legalize or authorize any and every usage or custom in violation of their own articles which they may have theretofore indulged in or were indulging in at the time the act was passed.

Our conclusion is that, the relators having failed to show any title to the offices in themselves, the order appealed from should be reversed, and the proceedings remanded, with directions to the court below to quash the information. It is so ordered.

CANTY, J.

I concur. This corporation was so irregularly organized, and has been so irregularly conducted, that it seems to me there is now no way to appoint de jure officers for it. By force of the curative act (Sp. Laws 1877, c. 245), the corporation itself may have a de jure existence; but this curative act merely legalizes what had been done in the past, and does not provide any method of proceeding to elect members or officers in the future. The five original incorporators were mere trustees for the beneficiary, which was represented by the conference. They surrendered their trust to their successors about 25 years ago, before said curative act was passed, and while the articles of incorporation were so defective that the corporation was only a de facto corporation. Under these circumstances the original incorporators cannot now be regarded as members of the corporation, and for years the corporation has had nothing but de facto members and officers, viz. the trustees appointed from time to time by the conference, and each set of these de facto officers and members has in turn surrendered their trust to their

successors, and ceased to be even de facto members of the corporation.

It may be true that said curative act legalized the appointment of the particular set of trustees in office when the act was passed, and, if so, they can with much more show of reason claim to be the present de jure trustees than can the five original incorporators. But when the term of said set of trustees expired they stepped out, as under the circumstances it was their duty to do, and were succeeded by another set; so that they in fact ceased to be either members or trustees, as was the intention of all parties. It cannot be held that this curative act made a corporation wholly different from what all parties had always intended it to be, or gave the officers and members thereof a tenure of office or membership wholly different from what was intended. The acting trustees were the only members. When their term expired they ceased to be members, and no way was provided, either by articles of incorporation or statute, for the selection of new members or officers.

The later curative acts found in the general statutes do not apply to corporations which cannot be organized under the general laws of this state. This corporation is one which could not be organized under any general law, and be given the powers that have always been exercised in connection with it. There is no authority under the general statutes for organizing a corporation whose officers and members shall be selected for a limited time by some voluntary unincorporated association. And if this practice is rejected in this case, there is no way in which such officers or members can be selected, and the corporation will have none; therefore these general curative acts do not apply. We have, then, an irregular, anomalous corporation, whose past acts were at one time legalized, but the terms of its officers and members expired, and there is no legal way to appoint new officers or members. The relators are therefore not legal officers of the corporation.