SPENCE v. UTAH STATE AGR. COLLEGE et al.

No. 7573.   Decided December 8, 1950.   (225 P. 2d 18)

See 14 C. J. S. Colleges and Universities, Sec. 16.· Resort to debates of constitutional convention as aid in construing constitution, see note, 70 A. L. R. 5. See, also, 11 Am. Jur. 706.

*Benjamin Spence,* Salt Lake City, for plaintiff.

*Clinton D. Vernon,* Atty. Gen., for defendant.

*Wm. H. Leary,* Salt Lake City, amicus curiae.

LATIMER, Justice.

This is an original action commenced in this court by plaintiff to restrain the Utah State Agricultural College, a corporation, and its Board of Trustees, from proceeding further in the proposed issuance of bonds authorized to be issued and sold by Chapter 126, Laws of Utah, 1947.

In view of the importance of the questions originally suggested, and because the University of Utah believed it might be adversely affected by a decision in this case, permission was granted by this court to have counsel for that institution file a brief as amicus curiae.

In 1947, the legislature of this state enacted Chapter 126, Laws of Utah, 1947, which authorized and empowered

the Board of Trustees of the Utah State Agricultural College to construct, equip and furnish buildings, or additions to existing buildings, on the campus of the Utah State Agricultural College; to issue revenue bonds to finance the cost of the construction; to fix rents, charges and fees to assure payment of principal and interest on such bonds; to enter into agreements to effect the purposes of the act; to make agreements with the United States of America or any agency or instrumentality thereof; and to lease or contract with certain non-profit corporations.

The Board of Trustees of the college, pursuant to this act, complied with the provisions necessary to issue bonds in the sum of $750,000 for the purpose of erecting a Student Union Building. Plaintiff seeks to restrain the sale and disposal of the bonds.

In the original petition filed by plaintiff it was sought to limit the court to a determination of one question only, namely, whether or not the proposed bonds constituted a debt within the meaning of the provisions of Section 2, Article XIII, and Section 1, Article XIV of the Constitution of the State of Utah, and therefore, invalidly authorized and issued because of violating the provisions of the two sections. Amicus curiae, however, sought to enlarge the issues and bring into focus all of the constitutional questions which have arisen in connection with numerous attempts by the legislature to control and supervise the fiscal policies, operations and functions of the two state institutions.

After giving consideration to the questions presented by the brief of amicus curiae, we have concluded that the principles therein discussed, with one exception—namely, is the Board of Trustees of the college legally constituted? —are severable from the issues presented by the Agricultural College and need not be discussed in this opinion. We dispose of this one question to set at rest any uncertainty

as to the powers of the present Board to act within statutory or constitutional limits.

The legislation pertaining to the Utah State Agricultural College up to the time of statehood is substantially as follows: By Chapter II, Compiled Laws of Utah 1888, page 663, §§ 1852-1857, 1862, 1868, 1870, the Agricultural College of Utah was created. For convenience of the reader, sections of the chapter important to this decision are set out in full:

"s. 1. There shall be established the Agricultural College of Utah, to be located at any place in Cache county that may be designated by the trustees.

"s. 2. For the purpose of erecting suitable school buildings and purchasing land on which to conduct agricultural experiments, the sum of *twenty-five thousand dollars, or so much thereof as is necessary, is hereby* appropriated out of any money in the Territorial treasury not otherwise appropriated.

"s. 3. The Governor and secretary of the Territory, and the assessors of the counties of Cache, Davis, Utah, Salt Lake and Sanpete counties and their successors in office shall be ex-officio trustees of the agricultural college.

. "s. 4. The trustees shall elect one of their number a president, and shall appoint a superintendent, a secretary, and treasurer. Said trustees shall take charge of the general interests of the institution, and shall have power to enact by-laws and rules for the regulation of all its concerns, not inconsistent with the laws of the Territory. They shall have the general control and supervision of the agricultural college, the farm pertaining thereto, and such lands as may be vested in the college by Territorial legislation, of all appropriations made by the Territory for the support of the *same, and also of lands that may hereafter be donated by the Territory, or* the United States, or by any person or corporation, in trust for the promotion of agricultural and industrial pursuits. They shall be required to immediately enter upon the duties of their office, and shall, with the *exception of the Governor and secretary, qualify by giving bonds with* security to the people of the Territory of Utah in the penal sum of one thousand dollars each, conditioned for the faithful performance of the duties of their office, to be approved by and filed with the auditor of public accounts.

"s. 5. The trustees shall have supervision of the erection of the college buildings, and shall make all purchases and contracts for said buildings in accordance with such plans, drawings and specifications as the

said trustees shall have adopted. They shall, in all contracts entered into, require bonds to be given for the faithful performance of the same, and shall keep an accurate record of their proceedings, which shall embrace copies of all contracts entered into, and a minute and accurate record of all expenditures showing the amount paid, to whom paid, and for what service rendered, and materials purchased, and whether paid on account or in performance of contract; and for all payments made vouchers shall be taken.

"s. 6. The trustees shall make a report to the next general Assembly of the Legislature, showing the amount of work done, the condition of the buildings, a detailed account of the expenditures on the same, the amount of land bought, its cost and condition and the improvements thereon.

\* \* \* \* \* \*

"s. 11. When the said college shall be ready for organization the trustees shall establish the proper professorships, and appoint the professors and officers with their salaries and compensations. They can remove such officers at their pleasure.

\* \* \* \* \* \*

"s. 17. The trustees shall with the advice of the faculty prescribe the books to be used in the institution, and confer for similar or equal attainments, similar degrees and testimonials to those conferred by agricultural colleges elsewhere.

\* \* \* \* \* \*

"s. 19. The trustees of the agricultural college shall take charge of the agricultural experiment station, purchase suitable lands, erect needed buildings and appoint necessary officers and assistants to conduct the experiments mentioned in the preceding section. They shall cause bulletins and reports of progress to be published and mailed as required in the act of Congress aforementioned."

In 1892 the Legislative Assembly for the Territory of Utah, Laws 1892, c. 37, amended the Act of 1888, the amendment of importance being that which affected Section 3, dealing with who were to be the trustees. After the amendment, the section read as follows: "The governor shall appoint, subject to confirmation by the Council, seven trustees of the college."

The foregoing acts are the only legislative pronouncements up to and including the year 1896. It was with this legislative history as a background that the Constitutional Convention considered Article X, Section 4, of the

Constitution of the State of Utah, which, as enacted, provided as follows:

"The location and establishment by existing laws of the University of Utah, and the Agricultural College are hereby confirmed, and all the rights, immunities, *franchises* and endowments, *heretofore granted or conferred,* are hereby perpetuated unto said University and Agricultural College respectively." (Italics ours.)

For the purposes of this case we need not determine with refinement or nicety what the Constitutional Convention intended to grant to the Agricultural College when it used the phrase "all rights, immunities, franchises and endowments heretofore granted or conferred." We need only discuss whether, by the use of this terminology, the framers of the Constitution intended to freeze the size and composition of the Board of Trustees of the College so that its membership could not be increased by subsequent legislatures. In this connection we call attention to the fact that the trustees of the college are not contesting the acts of the legislature. Over the years they have accepted the legislative mandates, reorganized the board to comply with a number of legislative changes including those prescribed by Chapter 41, Laws of Utah, 1929, which vested control and supervision of the college in a board of trustees consisting of the Secretary of State and twelve resident citizens to be appointed by the Governor, and more recently reorganized to comply with the provisions of Chapter 90, Section I, Laws of Utah 1945, which provides for a board of fourteen members. Furthermore, they are presently acting in accordance with the legislative provisions which authorized the issuance of bonds.

In order to determine whether the legislative acts changing the number of trustees are constitutional, so that the board of trustees can exceed seven members, it becomes necessary to determine whether or not the amending sections in any way contravene the provisions of Article X, Section 4, previously quoted. If the legislative acts are

not in conflict with the constitutional provision, it becomes our duty to give the latest one force and effect.

Prior to the adoption of the constitutional provision, the territorial legislative assembly had made changes in the composition of the board of trustees. ██ During the early days of its existence the college was not set up as a separate public corporation and the Legislative Assembly assumed the power to change its governing body. In the discussions on the constitutional provision by members of the Constitutional Convention no reference was made to the number of members which would constitute the board and no discussions or statements are recorded which would in any way indicate an intent to fix the size and composition of the board in perpetuity. The constitutional article does not specifically fix the number of members, and, while the article does make mention of perpetuating the rights, franchises, immunities and endowments previously granted, its wording does not, even by implication, suggest an intent to oust the legislature from ever dealing with any affairs of the college, be the dealing favorable or prejudicial to its welfare. In addition, we have a contemporaneous construction by the 1896 legislature as it concluded the constitutional provision did not prevent a change in the board of regents of the state university. The legislative guide-posts further show that the territorial assembly and the Constitutional Convention were solicitous of the welfare of the school and it would appear unreasonable for us to contrarily assume the convention intended to fix with finality a board of seven members and thus prevent subsequent legislatures from granting to the college an opportunity to obtain additional help and advice if the institution developed in size and importance. Such an intent might be considered as contrary to the best judgment of ordinary men and inimical to the welfare and advancement of the college. Accordingly, it would require positive pronouncements in the Consti-

tution before we would find that the members of the Constitutional Convention intended to forever close the door on the right of subsequent legislatures to increase the number of trustees.

A doctrine firmly established in the laws of most jurisdictions is that a state constitution is in no manner a grant of power, it operates solely as a limitation on the legislature, and an act of that body is legal when the constitution contains no prohibition against it. This state is committed to that doctrine. In the case of *Salt Lake City* v. *Christensen Co.*, 34 Utah 38, 95 P. 523, 525, 77 L. R. A., N. S., 898, Mr. Justice FRICK supported the rule in the following language:

"It is too well settled to require more than passing mention that state Constitutions are mere limitations and not grants of powers."

Another doctrine of constitutional law which is applicable in the present instance is referred to by Mr. Justice FOLLAND in the case of *Tintic Standard Mining Co.* v. *Utah County*, 80 Utah 491, 15 P. 2d 633, 637. In that case he stated:

"We are restricted to this definition because of another canon of constitutional construction that terms used in the Constitution must be taken to mean what they meant to the minds of the voters of the state when the provision was adopted."

With these rules in mind, we search the enactments of the Territorial Assembly to determine whether there was an express or implied limitation on the power of the legislature to change the board of trustees and what the terms "rights" and "franchises" meant to the people of the territory and the state when the constitutional article was adopted. We have eliminated immunities and endowments as not being involved in this action and thus limit our discussion to rights (powers) and franchises. We assume for the purposes of this case that all rights and franchises which had been granted prior to statehood were per-

petuated; that the Constitution did not enlarge upon those which had been granted, but merely recognized the ones in existence at the time the Constitution was adopted.

Dealing first with the rights, the Territorial Assembly authorized the existence and operation of the college, but it was not created as a separate public corporation. The act, as amended in 1892, provided for a board of trustees and clothed it with the following powers: To enact by-laws and rules for the regulation of the college not inconsistent with the laws of the territory; to control and supervise the college, the farm pertaining thereto, and such lands as the college might obtain; to control and supervise all appropriations made by the territory for the support of the college; to supervise the erection of the college buildings; to purchase and contract for buildings; to select and appoint professors, instructors and other officers and assistants of said college; to prescribe the books to be used in the institution; to establish an agricultural experiment station; and to exercise such other powers as might be incidental or necessary to carry out the expressed powers.

In this specific enumeration of powers there was no mention made of the right of the board of trustees to select its personnel and that right is specifically exempted by the provision of the act of 1892 which prescribes that the Governor shall appoint the trustees, subject to confirmation by the legislative council.

From the wording and structure of the two acts passed prior to the adoption of the Constitution we conclude that when the members of the Constitutional Convention use the words "rights heretofore granted or conferred" and when the people of the territory ratified the Constitution they intended to grant to the board of trustees the same rights to control the affairs of the college as might be granted to the governing bodies of other

unincorporated institutions or departments of the state, but that they did not intend to grant to the trustees the right to form and operate as a corporate entity. All acts dealing with the college are silent as to the entity created and so, by failing to expressly form a corporation and by failing to vest the usual corporate powers in the board of trustees, there was indicated an intention to continue the college as an arm of the state. The grant to the trustees was to supervise and control the college activities, not to determine the personality of nor the number necessary to constitute the board, unless those rights and privileges can be considered as having been granted because they are the essence of and included in a franchise.

In discussing the nature and extent of any franchise that might have been granted by our constitutional provision, we desire first to direct attention to the dissimilarity in the cases cited by amicus curiae and the present action. The states of Minnesota and Idaho have a constitutional provision similar to Article X, Section 4, supra, and each jurisdiction has considered the extent of the franchise granted. In those jurisdictions, prior to the time the constitutions were adopted, the legislative bodies created the colleges as public corporations with all corporate rights and privileges. In the state of Michigan the constitutional provision continued the university as a public corporation which had been previously granted corporate powers.

The act creating the University of Minnesota, Laws 1851, c. 3, § 7, which is quoted in *State ex rel. Peterson, Atty. Gen.* v. *Quinlivan*, 198 *Minn.* 65, 268 N. W. 858, 860, provides as follows:

"Sec. 7. The regents of the university and their successors in office, shall constitute a body corporate, with the name and style of the 'Regents of the University of Minnesota,' with the right as such, of suing and being sued, of contracting and being contracted with, of making and using a common seal, and altering the same at pleasure."

The Constitution of the state of Michigan, as quoted in the case of *Sterling* v. *Regents of the University of Michigan,* 110 Mich. 369, 382, 68 N. W. 253, 256, 34 L. R. A. 150, Article 13, Sec. 7, of the Constitution of 1850, provides:

"The regents of the university, and their successors in office, shall continue to constitute the body corporate, known by the name and title of the 'Regents of the University of Michigan.'"

The Act creating the University of Idaho, as quoted in the footnote in the case of *Dreps* v. *Board of Regents of the University of Idaho,* 65 Idaho 88, 139 P. 2d 467, 468, provides as follows:

"Sec. 3. The Board of Regents and their successors in office, shall constitute a body corporate, by the name of 'The Regents of the University of Idaho,' and shall possess all the powers necessary or convenient to accomplish the objects and perform the duties prescribed by law, and shall have the custody of the books, records, buildings and other property of said University. * * * " 15th Territorial Sess. Laws (1888-89) pp. 17-21.

To illustrate why the courts of last resort of those jurisdictions concluded their state constitutions created a constitutional corporation untouchable by subsequent legislatures we quote from the case of *State ex rel. Peterson, Atty. Gen.,* v. *Quinlivan,* 198 Minn. 65, 268 N. W. 858, 861, supra:

"We come next to evaluation (to the extent presently needed) of the 'franchises' confirmed and perpetuated by the State Constitution. If government by 12 regents, elected by joint convention of the Legislature, is part of such franchises, as we hold it is, there is an end of the matter. It may or may not be important that the plural 'franchises' was used. The mere right to be a corporation is seldom, if ever, all there is of the principal franchise of a corporation. It includes also the quality of durability, and the manner chosen to insure succession for a limited period or in perpetuity.

"The regents at the time being were the 'body corporate.' (Laws 1851, c. 3, § 7.) How was it to be perpetuated? What was the mechanism of corporate succession? How was its proper working assured? If the Constitution has answered, it is not for the Legislature, but only for the people themselves, by amendment, to change the answer. What are the scope and context of a franchise to be a corporation is not to be answered by affirming merely that it confers the right to be a corporation. Remains consideration of, and answers to, the queries: What kind of a cor-

poration? How to be governed and for what purpose? In what manner and to whom is succession to go?

\* \* \* \* \* \*

"We are considering a 'primary or creating franchise' (3 Thompson, Corporations [2d Ed.] § 2863) and not 'secondary or special franchises' (Id. § 2865). 'The right to be a corporation' is the primary franchise, residing 'in the corporation itself. \* \* \* Unlike a conventional contract between natural persons, the state is a party to it, and when the legislature has prescribed the nature and extent of the franchise, and how it shall be exercised, the courts will never permit it to be enlarged or changed by a usage or custom in violation of the statute.' *State ex rel. Brun* v. *Oftedal,* 72 Minn. 498, 514, 75 N. W. 692, 697. It is but axiomatic that, if the franchise be granted by a Constitution, it cannot be diminished by a statute. It is the primary franchise that gives corporate life. Hence, its inclusions cannot be delimited without determining what kind of life is given, to what purpose it is to be lived, and by what members. The organ designated by the 'creating franchise' for insuring corporate functioning and continued life is as much part of the franchise as are its organs part of that unit known as the human body."

As previously mentioned the acts passed by the territorial legislative assemblies of the Territory of Utah did not create a public corporation and so the Constitution could not perpetuate one. This poses the question as to why the Constitution was worded to include the term "franchises." To escape the claim that a legislative body is presumed not to have used useless words and phrases, we look to the acts of the legislative assembly to determine what that body intended to grant when it used that term. While the right to be, or to exercise the powers of, a corporation may be one element of a franchise, the term is often used in a broader sense. It has been said that a franchise is a right or privilege granted by the sovereignty to one to do some act or acts which he could not do without the grant. The exact line of demarcation between a right and a franchise granted by a state may not be clearly drawn, but in view of the fact that Article X, Section 4, deals with both the Agricultural College and the University of Utah (which was a public corporation), and that legislative acts prior to the Constitution had conferred many rights and privileges upon the trustees or

regents of the institutions, the members of the Constitutional Convention may have concluded that in order to assure perpetuation of those things which had been previously granted, all-inclusive language should be used. Even though all-inclusive language was used it is contrary to the expressions of a contemporaneous legislature to hold that the word "franchise" included a right to fix the size of the board of trustees. In 1896 the size and manner of appointing regents to the University of Utah was changed and this definitely indicates a belief by the people who were familiar with the subject that this right to mold the governing body to meet changing conditions had been reserved to the people and not granted to the institution.

At the time of statehood the Agricultural College did not have autonomy but was merely a state institution and any franchise granted by the Constitution did not perpetually fix the form nor nature of its governing body nor limit the number of trustees that might be appointed to administer its affairs. At least these two matters were left free for subsequent legislatures to deal with. This being so, we hold the board of trustees is legally constituted. We need not and do not pass on the right of the legislature to deal with any other or different rights, immunities, franchises or endowments which might have been granted to the colleges by the Constitution.

The principal issue which precipitated this litigation revolves around the question of whether the bonds when issued create a debt against the State of Utah. In the year 1947, there was duly passed and enacted by the legislature of this state an act providing for the construction of certain buildings on the campuses of the University of Utah and the Utah State Agricultural College, with certain restrictions of liability, for payment of the bonds.

Chapter 126, Laws of Utah, 1947, insofar as necessary to this decision, is as follows:

"That for the purpose of paying all or part of the cost of the construction, equipment, and furnishing of any such building or any addition to or remodeling of existing buildings, the Board of Regents and/or the Board of Trustees of the institution for which such building or addition to or remodeling of existing buildings (hereinafter referred to as 'the building') is to be constructed, furnished, and equipped (which Board of Regents or Board of Trustees are hereinafter referred to as 'the Board') is authorized to borrow money on the credit of the income and revenues to be derived from the operation of the building, and on the imposition of student building fees or both, or from other sources other than by appropriations by the Legislature of the State of Utah to such issuing institutions and in anticipation of the collection of such income and revenues, to issue negotiable bonds in such amount as may in the opinion of the Board be necessary for such purposes, and is authorized to provide for the payment of such bonds and the rights of the holders thereof as hereinafter provided. * * *

"That the bonds issued hereunder shall not be an indebtedness of the State of Utah or of the institution for which they are issued or the Board of Regents or Board of Trustees thereof, but shall be special obligations payable solely from the revenues to be derived from the operation of the building and student building fees, etc., and the Board is authorized and directed to pledge all or any part of such revenues to the payment of principal of and interest on the bonds. * * *"

In accordance with this act the Board of Trustees of the Utah State Agricultural College enacted appropriate resolutions authorizing the issuance and sale of the bonds and prepared a form of bond which substantially complies with the legislative act. There is included in the resolution the statement that "the bonds are issued under and pursuant to Chapter 126 of the Laws of Utah, 1947," and in the body of the bond it provides that the bonds are special obligations payable solely from revenue to be derived from the operation of the union building, including the proceeds of student fees, and that the bond is not an indebtedness of the State of Utah, or the Utah State Agricultural College, or the Board of Trustees.

Plaintiff complains that the issuance of the bonds in the manner proposed is in contravention of Article XIII, Section 2, and Article XIV, Section 1, of the Constitution of this State. These sections are as follows:

"All tangible property in the State, not exempt under the laws of the United States, or under this constitution, shall be taxed in proportion to its value, to be ascertained as provided by law. The property of the United States, of the State, counties, cities, towns, school districts, municipal corporations and public libraries, lots with the buildings thereon used exclusively for either religious worship or charitable purposes, and places of burial not held or used for private or corporate benefit, shall be exempt from taxation. Water rights, ditches, canals, reservoirs, power plants, pumping plants, transmission lines, pipes and flumes owned and used by individuals or corporations for irrigating lands within the state owned by such individuals or corporations, or the individual members thereof, shall not be separately taxed as long as they shall be owned and used exclusively for such purposes. Power plants, power transmission lines and other property used for generating and delivering electrical power, a portion of which is used for furnishing power for pumping water for irrigation purposes on lands in the State of Utah, may be exempted from taxation to the extent that such property is used for such purposes. These exemptions shall accrue to the benefit of the users of water so pumped under such regulations as the legislature may prescribe. The taxes of the indigent poor may be remitted or abated at such times and in such manner as may be provided by law. The legislature may provide for the exemption from taxation of homes, homesteads, and personal property, not to exceed $2,000 in value for homes and homesteads, and $300 for personal property. Property not to exceed $3,000 in value, owned by disabled persons who served in any war in the military service of the United States or of the State of Utah and by the unmarried widows and minor orphans of such persons may be exempted as the legislature may provide.

"The legislature shall provide by law for an annual tax sufficient, with other sources of revenue, to defray the estimated ordinary expenses of the state for each fiscal year. For the purpose of paying the state debt, if any there be, the legislature shall provide for levying a tax annually, sufficient to pay the annual interest and to pay the principal of such debt, within twenty years from the final passage of the law creating the debt." Article XIII, Section 2, as amended Nov. 5, 1946.

## Article XIV, Section 1, of the Constitution of Utah, provides:

"To meet casual deficits or failures in revenue, and for necessary expenditures for public purposes, including the erection of public buildings, and for the payment of all Territorial indebtedness assumed by the State, the State may contract debts, not exceeding in the aggregate at any one time, an amount equal to one and one-half per centum of the value of the taxable property of the State, as shown by the last assessment for State purposes, previous to the incurring of such indebtedness. But the State shall never contract any indebtedness, except as in the next Section provided, in excess of such amount, and all monies arising from loans

herein authorized, shall be applied solely to the purposes for which they were obtained. (As amended November 8, 1910.)"

For the purposes of this case we will assume, but not decide, that if the bonds are an obligation of the state their issuance would be prohibited by the constitutional provisions.

Plaintiff relies principally upon the holding of this court in the case of State ex rel. University of Utah v. Candland, 36 Utah 406, 104 P. 285, 24 L. R. A., N. S., 1260. In that case the legislature passed an act which permitted the regents of the University of Utah to expend $250,000 to erect a central building on the University campus. The State Board of Land Commissioners was directed to convert sufficient investments of the University permanent land fund into cash and to loan the same, as well as other cash on hand, to the University, with the provision that the loan would create a debt on the part of the University but not of the State of Utah. The act further provided that interest on the investments of the University land fund should be paid to the University of Utah; and, that the Board of Regents of the University was authorized and empowered to pay the principal and interest due on the obligations out of funds appropriated for its general maintenance.

The contention in that case was that the act violated certain constitutional provisions and the important principle there announced was that that act created an obligation which must be paid by the state. The following language of Mr. Justice FRICK points to the reason for that holding, 36 Utah at page 427, 104 P. at page 294:

"*  *  * The legal effect of the act of 1909, so far as it affects the relations of the university and the state, may be said to be that while the obligation authorized by the act is in terms made the debt of the university, yet, in the same act, the university is entirely absolved from the duty and burden of paying it, while the state is made to assume this duty, and is thus made the real debtor. If this be so, it becomes entirely immaterial whether the board of regents executed the notes provided for in the name

of the university or not. The state must, nevertheless, pay both the principal and interest of those notes, if they are paid at all. These notes, therefore, both in law and fact, are state obligations. But it is nevertheless contended that the notes are in fact the notes of the university and thus do not constitute a state indebtedness, and hence do not fall within the constitutional debt limit any more than debts of counties, cities, school districts, and other like agencies of the state come within this limit. We cheerfully concede that county, city, and school district debts are not state obligations, and do not come within the constitutional inhibition. From the facts and circumstances disclosed, however, it seems clear that the debt in question is not analogous to an ordinary county, city, or school district debt.

"But apart from all that has been said, we think it is a state obligation for other reasons. The legislative act itself placed the duty upon the state to pay it out of state funds, all of which are to be obtained from future tax levies. Again, in section 2 of the act it is provided that the interest upon the very fund, which it is claimed is loaned to the university, shall continue to be paid to the university. It is thus in effect provided that the interest upon the loan shall be paid to the alleged borrower. Who is it that must pay this interest? It can be no one but the state of Utah. The state of Utah is therefore obligated to pay the accruing interest upon a debt declared to be the debt of the university. Moreover, if we consider the nature of the funds that are authorized to be loaned by the act and the relation of the state to those funds, by reason of the express constitutional provision referred to, then there remains no doubt as to whose obligation it is. The funds authorized to be turned over to the university are all trust funds which the state is obliged to protect against loss or diversion. The state, by an express pledge in the Constitution, therefore, must maintain the fund intact.

"If the state, therefore, authorizes any one to use $250,000 of this fund, the state, impliedly at least, guarantees the repayment thereof. The state is thus always obligated as a guarantor of the fund. If this were all, however, and it were clear that the obligation to pay the debt rested upon some other agency than the state, we would not be inclined to hold that it is the state's obligation although the state stands in the relation of guarantor. When the whole act is considered, however, it is very clear that it was declared to be the debt of the university for no other purpose than to avoid coming in conflict with the debt limit contained in the Constitution. This purpose is so manifest from the act itself that it hardly needs to be pointed out. * * *"

The reasons for holding that act unconstitutional are not present in this instance. Here, we have a bona fide attempt by the legislature to free the state from liability for repaying the bonds. This act provides the indebtedness shall not be a debt of the state, the

Utah State Agricultural College, or the Board of Trustees. The resolution authorizing the issuance of the bonds has the same provisions. The bonds which will be sold to the public show on their face that they shall not become an obligation of the state, the college, or the board; that money necessary for repayment cannot be obtained from sources other than from the revenue and income derived from the operation of the student union building and the student fees paid by students of the college; and that the income and revenue from such sources is all that is pledged to payment of the principal and interest of the bonds. There is no requirement that the state contribute any funds to the project; that it be required to guarantee the payment of the loan in the event the revenues are insufficient; or that any purchaser of the bonds can in any way hold the state liable for repayment of the sum realized from the sale of the bonds. Furthermore, there is no guarantee on the part of the state that the sources of revenue will be sufficient to meet the bonded indebtedness and that if the funds are insufficient the state will in any way help to make up the deficit.

Questions similar to those presented by this litigation have in recent years been answered by courts of last resort of many jurisdictions. In the case of *State ex rel. Fatzer* v. *Board of Regents of State of Kansas,* 167 Kan. 587, 207 P. 2d 373, 376, the legislature authorized the board of regents of the state of Kansas to issue and sell bonds to obtain funds for the construction of facilities connected with the Kansas State College of Agriculture and Applied Science. The act authorized the board to limit the sources of repayment to the income and revenue from the constructed facilities. Mr. Justice WEDELL, speaking for that court, answered one of the contentions made in this case in the following language:

"In the second place, if the debt represented by the bond technically could be designated as a debt of the state, which we think it cannot, it is

nevertheless not a debt prohibited by the constitution. Debts, within the contemplation of constitutional provisions, are debts to be paid by a general property tax 'and not from funds to be raised in some other manner. *State ex rel.* v. *Kansas State Highway Comm.*, 138 Kan. 913, 917-918, 28 P. 2d 770; *State ex rel. Boynton* v. *City of Kansas City*, 140 Kan. 471, 476-477, 37 P. 2d 18; *State ex rel. Beck* v. *Kansas City*, 149 Kan. 252, 256-257, 86 P. 2d 476. These bonds do not pledge the faith and credit of the state. They do precisely the contrary. The bondholder knows he may look only to the revenue and income from the building, or buildings, for payment. Whether he desires to make such an investment is a matter left entirely to his own discretion and judgment."

In the case of *Loomis* v. *Keehn,* 400 Ill. 337, 80 N. E. 2d 368, 371, the Supreme Court of Illinois held that a public corporation could pledge the income from property and limit the bondholder to a claim against the income without creating a state obligation. In that case the Illinois legislature created the Illinois State Armory Board and authorized it to borrow money and issue bonds and to pledge any and all property and income of the board to secure the payment of the bonds. In connection with the question as to whether or not the bonds would constitute a debt against the state of Illinois, that court announced the following rule:

"We consider the provisions of the State Armory Board Act, authorizing a pledge of the income or property of the Board, as creating a debt against the property of the Board, and to which, alone, the holders of its bonds may look, and this does not create a debt against the State, as the statute does not so designate and we have frequently held that under similar statutes the public body benefiting from such a corporation is in no way obligated to pay the bonds secured by income, such projects being self-liquidating, and the pledge of the property partakes of the nature of the purchase-money mortgage. *People ex rel. City of Chicago* v. *Barrett,* 373 Ill. 393, 26 N. E. 2d 478; *Hairgrove* v. *City of Jacksonville,* 366 Ill. 163, 8 N. E. 2d 187; *Rockford Savings & Loan Ass'n* v. *City of Rockford,* 352 Ill. 348, 185 N. E. 623; *Ward* v. *City of Chicago,* 342 Ill. 167, 173 N. E. 810; *Krause* v. *Peoria Housing Authority,* 370 Ill. 356, 19 N. E. 2d 193; *Maffit* v. *City of Decatur,* 322 Ill. 82, 152 N. E. 602."

For the benefit of the reader we cite the following additional cases supporting the general rule that payments from income and revenue are not state obligations: *Board of Regents of University of Arizona*

v. *Sullivan,* 45 Ariz. 245, 42 P. 2d 619; *State ex rel. Wilson*
v. *State Board of Education,* 102 Mont. 165, 56 P. 2d 1079;
*Arthur* v. *Johnston,* 185 S. C. 324, 194 S. E. 151; *Hopkins* v.
*Baldwin,* 123 Fla. 649, 167 So. 677; *State ex rel. Miller* v.
*Board of Education,* 56 Idaho 210, 52 P. 2d 141; *State* v.
*Regents of University,* 32 N. M. 428, 258 P. 571; *Arnold* v.
*Bond,* 47 Wyo. 236, 34 P. 2d 28; *State ex rel. Curators of
University of Missouri* v. *McReynolds,* 354 Mo. 1199, 193
S. W. 2d 611; *Keller* v. *State Board of Education,* 236 Ala.
400, 183 So. 268; *Van Hooser* v. *University of Kentucky,*
262 Ky. 581, 90 S. W. 2d 1029; *Fanning* v. *University of
Minnesota,* 183 Minn. 222, 236 N. W. 217; *State ex rel.
Public Institutional Building Authority* v. *Griffith,* 135 Ohio
St. 604, 22 N. E. 2d 200; *Baker* v. *Carter,* 165 Okl. 116, 25
P. 2d 747; *McClain* v. *Regents of University,* 124 Or. 629,
265 P. 412.

While this court has not passed on the identical prob-
lem, we have suggested that corporate municipalities may,
by limiting payment of bonds to a special fund, escape the
provisions of the Constitution which limit municipal debts.
In the case of *Utah Power & Light Co.* v. *Ogden City,* 95
Utah 161, 79 P. 2d 61, 65, we considered the propositions
of law involved when a municipality seeks to build a mu-
nicipal power plant and finance the construction from the
sale of bonds which are to be repaid out of the revenue
received from the operation. In that case Mr. Justice
HANSON, speaking for the court, reaffirms the rule of
previous cases and states our holding in the following
language:

"Further provisions of the contract may be referred to as we proceed
with our discussion. Manifestly, the quoted provisions of the contract,
bonds, and controlling ordinance bring this case directly within the 'spe-
cial fund' doctrine as recognized by this court in *Barnes* v. *Lehi City,*
74 Utah 321, 279 P. 878, and our subsequent decisions in the cases of
*Fjeldsted* v. *Ogden City,* 83 Utah 278, 28 P. 2d 144; *Wadsworth* v. *Santa-
quin City,* 83 Utah 321, 28 P. 2d 161; and *Utah Power & Light Co.* v. *Provo
City,* 94 Utah 203, 74 P. 2d 1191. In harmony therewith, it must be held

that the proposed revenue bonds in this case will not, if or when issued, be an indebtedness of the defendant City, and will not be invalid or void because of the limitation of debt contained in sections 3 and 4 of article 14 of the State Constitution. In no event will the City be legally or morally obligated for their payment. If the earnings of the proposed plant shall at any time prove insufficient to meet the obligations charged thereon, neither the defendant Ogden City nor any of its property, revenues, taxes, or other sources can be called upon to make good the deficiency.

"We are not here concerned with the limitation upon the special fund doctrine recognized by this court in the *Fjeldsted and Wadsworth Cases*, supra, to the effect that the revenues or income from an existing plant or utility cannot be pledged in addition to the revenues of an enlarged, improved or extended plant, to pay the cost of the improvements. In the instant case, Ogden City has no electric light or power plant or system. It is starting out to acquire one and to pay for it solely out of the earnings of that which it does not now possess even in small part. There is no place in the present plan for the contention that these earnings of the proposed plant are to be fed or fattened upon any revenues or resource the city now has or would have without the fruits of the contract and ordinance under attack in this case. The proposed plant must earn and pay for itself. To its earnings alone the holders of the proposed revenue bonds must look for payment. All contentions to the contrary must be overruled."

In keeping with the principles of law announced in the previously cited cases, petitioner's contention that the bond issue constitutes a debt against the State of Utah must be overruled. The legislative act expressly provides the bonds shall not be or become an obligation of the state and this stipulation is carried on the face of the bond. We are unable to see how the State of Utah could ever be called upon to pay these bonds or the interest thereon or be under any obligation to levy any tax for the purpose of paying any loss that might result to the bondholders. Under the terms of the act, the resolutions and the bonds, no bondholder could legally contend that the state, the college, or the board was obligated to pay the indebtedness represented by the bond. Neither can the state, the college, or the board be estopped to rely on the limitations contained in the legislative act as every purchaser of a bond is charged with actual knowledge that his security is limited to the revenue derived from

the building or the students' fees. If, knowing this, the purchaser elects to purchase the bonds, he cannot claim he is entitled to rely on the credit or taxing power of the state as his agreement is to the contrary.

The alternative writ of prohibition heretofore issued is recalled, and the motion to dismiss is granted. Each party will bear his or its own costs.

WADE and McDONOUGH, JJ., concur.

PRATT, Chief Justice (concurring in part).

I believe it unnecessary to make any statements concerning the University of Utah; and for that reason I confine my remarks to the Agricultural College. Furthermore, I express no opinion as to the relative merit of legislative control of the college as compared with its control were it held to be constitutionally independent.

I am not satisfied that to hold that the college is not a corporate entity, necessarily decides completely the issue of the status of the trustees. I am impressed with the thought that it is possible to have a public institution governed by a constitutional body, and this without delving into the question of the corporate character of the institution. Is the office of trustee for this college a constitutional office?

When the college was established in 1888, certain definite office holders were designated as ex officio trustees. There were seven of them, though not mentioned by number. Sec. 3, Laws of 1888, quoted in prevailing opinion. Obviously, though terms for their office were not fixed, their terms expired with the expiration of their terms in the office they held as Governor, Secretary and Assessors. In 1892 the Governor and Legislative Council determined that this form of selection of trustees was invalid, McCornick case (*McCornick* v. *Thatcher*) 8 Utah 294, 30 P. 1091, 17

L. R. A. 243; and the legislature provided that the Governor should appoint seven trustees. Nothing was said, however, as to terms of office. Presumably then, their service was subject to the will of the appointing authority or at least during good behavior. Although terms of other offices under the Organic Act were fixed, there is nothing either in the act or the laws of 1892 that fixes a term of the trustees.

This is the picture we had when our constitution was adopted. These trusteeships are not mentioned in the constitution as offices of any kind. The prevailing opinion quotes the wording of Sec. 4, Article X of our constitution which refers to the college. If it is proper to infer from such wording that the trustees became fixed in number, as seven, it would seem to follow that their terms of office, should also be inferred; and thus the constitution fixed not only the office but its term; and neither could be changed by legislative enactment. I don't think anyone will contend that such is the case; and yet, if we are to consider the constitution as establishing these offices as constitutional, by inference only, it would seem that we should carry the inferences to their logical conclusion and include the term of office. There was a term of office of some kind contemplated by the laws existent prior to the Constitution. Presumably, the Constitution was adopting what the Territorial Legislature had provided.

I am not convinced that there is any justifiable inference that the offices of the trustees were frozen either in number or term by the constitution. Apparently the legislature of 1898 did not think so, at least as to terms of office. Sec. 2075, Rev. Stat. 1898. In that year they fixed terms. Again in 1907 they did the same thing. Sec. 2075, Comp. L. 1907. In 1909 Chap. 108, Laws of Utah 1909, they certainly thought that the number was not frozen as they provided for 9 trustees and fixed their terms of office. In

1911 they changed to 13 members, one of whom was the Secretary of State, Chap. 35, Laws of Utah 1911, and in 1929 this same number was carried on, with their terms fixed, except as to the Secretary of State. Chap. 41, Laws of Utah, 1929.

Considering what has happened over the years as to the number and terms of office of the trustees, and that no one, up to the present time evidenced any thought that the inferences found in Sec. 4 of Article X in any way froze either the number of trustees or their terms of office, to now hold that the offices were frozen in number, seems to me to overstress rather weak inferences, and to make a selection of favorable inferences and reject unfavorable.

I agree that the bonds in this case are not a charge upon state indebtedness. I think the principles of contract as discussed by Mr. Justice WOLFE clearly support that conclusion.

I agree, also, that as the vote for the bonds was unanimous, it makes little difference whether or not all trustees were *de jure*.

WOLFE, Justice (concurring in the result).

I concur in the conclusions that the bonds authorized by a resolution of the Board of Trustees of the Utah State Agricultural College for the purpose of raising $750,000 for the construction of a Union Building under question in this action will be obligations, the principal of and interest on which are payable only from the revenues to be derived from the building. Revenues derived from the building include student building fees and rentals from the use of the building; they are not an obligation of the State either directly or indirectly; they are not even an obligation of the College nor of the Board of Trustees thereof, but only a charge against revenues derived from the building.

I accept generally the reasons for this conclusion given in the opinion of Mr. Justice LATIMER. I would, however, prefer to place my concurrence in this regard on the simple fact that the contracts contemplated between the College and the holders of the negotiable bonds and evidenced by the proposed bonds and/or the resolution providing for their issuance and sale adopted and approved by the Board of Trustees of the College on the 14th day of April, 1950, in pursuance of which the bonds are to be issued, themselves provide that they are not to be obligations of the State nor of the College nor of the Board of Trustees of the College, but that they are special obligations payable only from the revenues derived from the operation of the building and student fees pledged thereto by the resolution of which the contemplated bond in substantial form and substance is a part.

No other source for the payment of the principal of and interest on the bonds is provided and the obligation to pay is expressly limited to such funds, and such funds are irrevocably pledged to the purpose of paying the principal of and interest on said bonds (and the establishment of reserves for such purposes) and for the cost of maintaining and operating said building.

Ch. 126, Laws of Utah 1947, p. 420, now contained in the 1949 Supplement to U. C. A. 1943 as § 75—31—1 to 12, pp. 60-65, furnishes legislative authority for the issuance and sale of negotiable revenue bonds for the purpose of financing the building of certain self-liquidating projects on the campuses of the Agricultural College and the University of Utah under certain conditions, limitations and restrictions. One of these restrictions is that the bonds issued should not constitute an indebtedness of the State of Utah or of the institution for which they are issued or of the Board of Regents or Board of Trustees, but shall be special obligations payable solely from the revenues to be derived

from the operation of the building and student building fees. The Board (either of Regents or Trustees, as the case may be—in this case the Trustees of the College) is authorized and *directed* to pledge all or any part of the revenues to the payment of the principal of and interest on the bonds. The Board is further authorized, by appropriate provisions to be contained in a resolution or resolutions authorizing the bonds, to also authorize to be included in the bonds certain covenants with the holders thereof. One of these covenants is provided for by clause 3 of Sec. 3 of Ch. 126, Laws of Utah, 1947, reading, "[To covenant] to collect student building fees from all students and to pledge said fees to the payment of building bonds." There is no doubt, therefore, that the resolution of the Board of Trustees of the College authorizing the issuance of these revenue-building bonds has provided for that covenant in the bonds, as well as other covenants providing for, "the use and disposition of the proceeds of the sale of such bonds," clause 1 of Sec. 3, Ch. 126, Laws, 1947; for the operation of the building and the collection and disposition of the revenues derived from its operation and all other necessary covenants. This would support what I have said, that not only by statute have the building revenues been made the sole source of payment of the principal of and interest on the negotiable building bonds but the bonds themselves have so provided by express language and/or by reference' to the resolution of the Board of Trustees of the College adopted and approved on April 14, 1950, providing for the bonds, thus including it in the contract with the holders.

I may hereafter, in my treatment of the contention of amicus curiae that the University of Utah and the Agricultural College have autonomy not subject to interference by the Legislature under Sec. 4 of Article X of our Constitution, again refer to the provisions of Ch. 126, Laws of Utah, 1947.

It is alleged in paragraph six of the petition which is the part of the petition which deals with the alleged unconstitutionality that "the issuance of said bonds, as so proposed, will create and constitute a debt within the meaning of the provision of Sec. 2, Art. XIII and Sec. 1 of Art. XIV of the Constitution of the State of Utah * * *."

Up to this point, I can see some sense in the allegation of paragraph six of the petition. I suppose what petitioner intends to assert is that the bonds as proposed are a State indebtedness despite the fact that they are by their terms expressly made not so and despite the fact that Ch. 126 expressly provides that the bonds issued under its provisions shall not be so and despite the fact that the resolution authorizing the bonds and the bonds themselves and Ch. 126 all expressly provide that they are not to be a State indebtedness but are to be paid solely out of revenues derived from the Union Building. The complete answer to the proposition lies in what was said above. The old case of *State ex rel. University of Utah* v. *Candland,* 36 Utah 406, 104 P. 285, 24 L. R. A., N. S., 1260, has been shown by the main opinion to cover a very different situation than we have in this case.

However, paragraph six goes on to state that these bonds as proposed will be a violation of Sec. 2 of Art. XIII and Sec. 1 of Art. XIV "in that no provision is made in the authorization of said bonds for the levying and collection of taxes to pay the principal of, and interest on, the said bonds, and that the said Act of the Legislature under which said bonds are proposed to be issued [which is Ch. 126 above considered at length] is therefore unconstitutional and void."

This appears to involve a complete non sequitur. How does it follow that an act permitting the construction of self-liquidating projects by bonds which provide for the payment of principal and interest only out of revenue

derived from the building is unconstitutional because it does not provide for the payment of principal and interest by the levying of taxes. The very purpose of Ch. 126 was to permit building construction by paying for it ultimately through revenue derived from the building and thus avoid the levy of taxes for the payment and the incurring of an obligation against the State. In doing so, we are told that, because the Legislature passed an act which did just that, viz. avoided the incurring of a State indebtedness by providing for the liquidation of the bonds issued to borrow money to construct the building only by the application of revenue derived from the building, such act is unconstitutional because liquidation of the bonds was not provided for in the authorization for them by a levy and collection of taxes to pay their principal and interest, which procedure would of course have resulted in incurring a State obligation, which was the very event Ch. 126 sought to avoid. If it had been included in the bonds, it would bring about two utterly contrary methods of liquidating the bonds. Under Sec. 2 of Art. XIV of the Constitution, the State may not contract debts in excess of one and one-half per centum of the value of the taxable property of the State. The ordinary manner in which a state contracts debts is by issuing bond obligations or certificates of indebtedness. The Legislature by the passage of Ch. 126 sought to avoid the effect of Sec. 1 of Art. XIV by permitting the issuance of building revenue bonds, the principal and interest of which were to make payable entirely and only out of revenues derived from the building itself and thus by making such bonds a charge against a special fund, to by-pass Sec. 2, Art. XIV.

These last allegations of paragraph six of the petition seem in effect to say, "Unless you include a provision for payment of the bonds by taxation the bonds are unconstitutional, but if you do include such a provision enough bonds may be finally issued so as to result in an unconsti-

tutional excess of indebtedness under Sec. 1 of Art. XIV." In short, "you must, to make the bonds a constitutional issue, put in a provision which may result in there being an excess of constitutionally allowed State indebtedness and therefore result in an unconstitutional bond issue." The proposition answers itself.

The necessity to obtain an opinion of the court of last resort as to the validity of bond issues in order to make them marketable unfortunately requires for a short-cut the device of setting up untenable objections in order to ask for prohibition. Perhaps in cases like this we should permit the application to this court for a declaratory judgment as to the constitutionality of such bond issues since the question of constitutionality is still open in spite of the incontestability of the bonds after certification by the Attorney General under Section 6, Chapter 126. Such procedure would save the raising of fictitious allegations in order to obtain the opinion of this court and yet when only law questions were involved obtain a declaratory judgment without going through two courts. It could be limited to bond issues for public purposes on questions of constitutionality only where all facts were stipulated. If such procedure does not come under our rulemaking authority, resort could be had to the legislature.

If the petitioner intended to attack the constitutionality of Ch. 126, that is, if he intended to question the power of the Legislature to permit institutions to issue bonds for the construction of self-liquidating projects, then he has done it in a most roundabout way. The simple, direct and complete answer to such a contention is that there is nothing in the Constitution which by express language or implication forbids the Legislature from enacting a law permitting the University and the College to issue self-liquidating revenue-building bonds.

The above would seem to fully dispose of the original

issue raised by the petition for prohibition and the motion to dismiss said petition were it not for the fact that the University of Utah appearing as amicus curiae is interested in the question of whether the issuance of bonds in pursuance of the provisions of Ch. 126, Laws of Utah, 1947, is not such a recognition of the power of the Legislature over the Agricultural College as will affect the question of a claimed autonomy of the University of Utah in matters relating to the governance of the University.

It is my opinion that a decision of this Court on the question above resolved (that these bonds are not an obligation of the State) is entirely severable from the question posed by amicus curiae and our reasoning on the question of whether the union building revenue bonds are an obligation of the State need not draw into the case any phase of the question as to the local autonomy or lack of it in either the Agricultural College or the University of Utah.

I think the main opinion so holds but the ratio decidendi by which it arrives at the separability of these two questions appears to me to draw in to some extent the very question which amicus curiae is apprehensive that we may decide and because of which apprehension it filed its brief as amicus curiae.

I think the question posed by amicus curiae is of great moment. It is certainly of very great significance if the college institutions have local autonomy to the extent that their governance is to be entirely free from any interference by the body that votes the appropriations to run the institutions, to wit, the Legislature. Yet it is clearly apparent that if the Legislature, because it controls the purse strings or because for other and broader reasons, has power to control the affairs of the two institutions directly or indirectly, it may exercise administrative rather than legislative functions over those institutions. Doubtless in states like Michigan, Minnesota,

Idaho, Oklahoma and some other states it was realized by the courts that any attempt by the legislatures to *govern* their state institutions of higher learning would be detrimental to those institutions and the purposes for which they were constituted, in that it would be an intrusion by a body whose personnel would in the main be unfitted to prescribe in the field of higher education. And thus there was read into constitutional expressions the intent to give to the governing boards of such institutions local autonomy, that is, power to govern the institution without interference by the Legislature. But whether this means that the autonomy must be total or only partial, whether the legislature is free to confer new powers not granted before statehood, with or without limitations, or impose new or additional duties on the governing boards of the institutions, or on the other hand, whether in their sphere of government of the institutions these boards have full and unlimited power by virtue of § 4, Art. 10 of the Constitution, present, in the light of cases cited by amicus curiae, questions which at this time I do not think need be decided. And I think my approach will avoid them by reasoning which will demonstrate the complete severability of the question posed by amicus curiae in all its ramifications, implications and phases from the question of the liability of the State for the bond indebtedness to be contracted to build the Union Building.

An examination of Ch. 126, Laws of Utah, 1947, reveals that said Ch. 126 is not a requirement that the University or College erect any new buildings. It is a tender by the Legislature of provisions to be pursued if the governing boards of either institution decides to erect any of the self-liquidating projects covered by the act, but it leaves to those governing boards the decision as to whether they shall build such structures.

If, therefore, the College has autonomous powers, that

is, if by Sec. 4 of Art. 10 of our Constitution it can be held that the College has been given autonomy or powers independent of the Legislature and it is further held that such powers cover not only the governance of the institution but that it is protected against intrusion by the Legislature in all matters of policy including enlargement of the College by the acquisition of new ground or erection of buildings, either because that itself is a function included in the field of government and control of the institution or because the autonomous powers are broader than those that pertain to governance, Ch. 126 does not appear to be an intrusion of the Legislature on any autonomous powers the Board of Trustees of the College may have. The act leaves the board free to build or not to build. It is permissive only. If the Board decides to build, Ch. 126 provides the manner and method of issuing revenue-building bonds which are made payable as to principal and interest only out of the revenues derived from the building which it constructed.

If for the purposes of this discussion we grant that the College is not required in order to issue revenue-building bonds to pursue the provisions of Ch. 126, but could, in the pursuance of its supposed autonomical powers, have resolved to build a Union Building, and to issue revenue bonds to finance that building, and make the payment of principal of and interest on those bonds payable only out of the revenue derived from fees and the use of the building, it could put into the bonds every covenant mentioned in § 3 of Ch. 126 and some others not therein set out, sell the bonds to the public, deposit the proceeds in a depository of its own choosing, make the contracts itself instead of through the Utah State Building Board, and issue its own warrants against the funds through its own fiscal agent.

Most of the provisions of Ch. 126, Laws of Utah, 1947, embody procedures and bond covenants which any public

body having power to issue revenue bonds would follow in the exercise of sound business principles designed to make the bonds marketable and to protect the funds derived therefrom and to insure the application of the money to the building contracts.

But there are provisions in Ch. 126 which impose duties on the Attorney General. Sec. 7 requires him to examine and certify the bonds "in accordance with such requirements as he may make." This imposes a duty on the Attorney General which perhaps the College might not be legally able to require him to do if it were acting not in pursuance of Ch. 126, but rather out of its own powers, although it is not clear that the Attorney General might not be required to assist the College in his capacity as advisor to state institutions.

Likewise, in order to make the bonds a trust investment for banks, savings funds, etc., under § 8 of Ch. 126, it may desire to follow and come under and be bound by the requirements of Ch. 126.

In such case, it may receive the benefits of Sec. 5 of the act and require the State Depository Board to name the depository for proceeds of bond sales, require the Utah State Building Board to make the building contracts and provide for the construction, furnishings and equipment of the building, and require the State Finance Commission to issue warrants upon the State Treasurer "against such funds for such amounts as he may from time to time find to be due upon audited itemized estimates and claims which bear the approval of the officials designated by the Board [of Trustees] for such purpose," all according to Sec. 5 of Ch. 126.

But I would see no reason for making a choice between issuing revenue bonds out of its autonomous powers if it has such powers and coming in under Ch. 126 since to do

the latter would not in any case result in a surrender of any of those autonomous powers but would give it certain privileges mentioned above which it might not be able to obtain if it did not accept the legislative provisions laid down in Ch. 126. I know of no principle which holds that a body with autonomous powers cannot bring itself under the aegis of the powers exercised by the Legislature for its benefit. It may choose not only to adopt certain procedures and provisions set out in Ch. 126, but rather choose to subject itself to the permissive legislative act. Thus it may obtain the certificate of the Attorney General and give the bonds the quality of incontestability—according to the provisions of Sec. 7 of Ch. 126.

If the College has autonomous powers to do all the above acts and others, does it surrender its power by choosing to follow methods laid down by the Legislature? If it already has those powers, it may adopt the provisions laid down in Ch. 126 by reference thereto or by adoption and make them its own. At least by pursuing them, it does not surrender its autonomous powers. Its autonomous powers cannot be surrendered. The College Board cannot shed them if it desired to. They remain extant and intact.

If the Board of Trustees of the College does not have autonomous powers, then it has no choice and must come under the requirements of Ch. 126 in order to issue the bonds at all or it could not build without an appropriation. And in that case it operates under the permissive provisions of Ch. 126 laid down by legislative enactment.

To sum up this segment of the case: I do not believe that an acceptance of the theory of autonomous powers in the Board of Trustees of the College means that there may not be fields into which such autonomous powers do not extend. If the College has autonomous powers to govern itself, that does not necessarily mean that such powers include the authority to acquire land and/or construct and add build-

ings to the College. But whether the College has autonomous powers and, if so, the extent of them, I refrain from expressing an opinion in accordance with my belief that it is not necessary in this case to do so. The power to increase the College plant or extend its area may still reside in the Legislature or at least only the Legislature may have the power to lay down provisions under which that may be done without making the cost a charge against the state. It would be somewhat startling to find that the College or University had the power to build and enlarge the physical plant and make the State pay the cost of it without authority from the Legislature. There is nothing in Ch. 126 which compels the College or University to accept the provisions of that chapter to enlarge the institutions. The College may not choose to build self-liquidating projects. Only if it choose to do so may it be required to use the plan and methods prescribed by the Legislature. Even if we consider a decision of either institution to erect buildings as part of its powers to govern, there is nothing inconsistent with those powers in the Legislature laying down the method to be followed if the institutions choose to build self-liquidating projects as to how that is to be accomplished under provisions which designate the manner and steps to be followed in order to do it without asking for an appropriation and without in any way burdening the state with the costs of the project. And certainly it would require a legislative provision to make the bonds tax free and thereby greatly increase their value and salability; also it would require legislative permission to enable the institutions to use the Utah State Building Board to make and execute contracts for the construction, furnishings and equipment of the building and probably to authorize the State Finance Commission to issue warrants upon the State Treasurer, all of which services are now tendered to the College and University under Sec. 5 of Ch. 126, Laws of Utah, 1947,

and which seemingly would not be available to them unless they took advantage of Ch. 126, which is a product of the Legislature and a grant of power from it.

Nor is it probable that either institution desiring to raise funds for building a self-liquidating project would be able to take advantage of the incontestability feature of Sec. 7 of Ch. 126, which depends on a certificate by the Attorney General that he has examined the bonds and finds legal obligations according to their terms.

I have cited the above features as evidencing a tender by legislative enactment of privileges to the college and university which may not be included in the concept of governance or, if included in that field because the government of an institution may be conceived of as taking in the construction of necessary buildings, nevertheless may require or make desirable legislative aid and to that extent make the institutions partially dependent on the Legislature.

And if I am correct in this conclusion, then it follows that whether we hold on the one hand that the College is dependent on legislatively-granted powers for its right to construct self-liquidating buildings, or on the other hand, that it may do so by fashioning the mechanics and machinery for issuing and selling revenue-liquidating bonds out of its supposedly constitutionally created autonomous powers, the result is the same.

The resolution of April 14, 1950, was passed in pursuance of Ch. 126, Laws of Utah, 1947. But the acceptance of the provisions of Ch. 126 is not a surrender of any autonomous powers which may have been given to the Board by the Constitution even if it is considered that its power to govern the institution takes in the power to acquire land and/or erect buildings because the legislative provisions of Ch. 126 are in aid of and not an interference with such autonomous powers as the Board may have. If

the Board has no autonomous power to erect buildings either as part of its powers to govern the institution or as a part of wider powers, then in that case it is a plain instance of using powers which the Legislature permitted it to exercise under Ch. 126. So it results in either case that it is not necessary to determine now whether the College is acting under legislatively-granted powers or under powers independent of the Legislature, and if we avoid determining that question we do not draw into this case the legal problems posed by amicus curiae. And if they need not be decided, it follows that the question of whether the bonds under consideration are obligations of the State may be determined entirely independently of any determination of the question of autonomy.

I am thus absolved from determining this question of autonomous powers. Being so absolved, I need not concur with or dissent from the statement that the College was not by the territorial Organic Act or by the territorial legislation "created as a separate public corporation." I do not need to determine whether it makes any difference if it is or is not a public corporation. At least it is a public body or institution and as such, regardless of whether it is a public corporation, its governing body may or may not have autonomy. In my view, the question of whether it was a public corporation is beside the point in this case and need not be decided.

Nor do I think I need for the purpose of this case determine whether the Constitution froze the number of trustees at seven, although I am inclined to share the view of the main opinion that Sec. 4 of Art. X of the Constitution did no such thing. Assuming for the moment that the number was frozen at seven, since all fourteen of the present trustees voted for the resolution authorizing the bond issue, seven of those votes were superfluous, but seven of these trustees must have been trustees de jure since they were appointed according to the method provided by the

Constitution and the de jure trustees all, as well as the superfluous ones, must have voted for the resolution unless the Constitution froze not only the number of trustees but gave the Board of Trustees the right themselves to select their successors. But I cannot see any basis for such a holding, whether the college is or is not a public corporation. I agree with Mr. Justice LATIMER that it would be deliberately going out of our way to hold that view which is against wisdom and common sense and the best interests of an institution which is to be ageless in its existence. Moreover, even though the College is held to be a public corporation and that the franchise granted to be such a corporation is made perpetual by the Constitution, it is unnecessary and unwise to hold that a part of the content of such franchise embraced a right in the Board of Trustees of self-perpetuation or to a selection of their successors. That is as far as I care to go in my opinion. I do not think it necessary to determine whether the Board of Trustees was constituted a public corporation, but only that no right was accorded to the Board to select its successors by § 4 of Art. X or any other provision of the Constitution. While I do not think it necessary to this case or perhaps even to the position of amicus curiae to determine whether the number of trustees was, by the Constitution, frozen, I am prepared in order to set the question at rest to join the majority in their holding that it did not do so and that consequently the Legislature is free to increase or decrease the number of members of the Board.

But I do not join with the majority in holding that the Agricultural College was before 1929 (by the Laws of Utah, 1929, it was made such) not a public corporation because I think it unnecessary to decide that question in order to reach the above result.

For the reasons stated above and with the reservations noted, I concur in the result.